# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| OTTO CANDIES, LLC, CANDIES | ) | |
| MEXICAN INVESTMENTS S. DE | ) | |
| R.L. DE C.V., COASTLINE | ) | |
| MARITIME PTE. LTD., MARFIELD | ) | |
| MARITIME INC., SHANARA | ) | |
| INTERNATIONAL SA., GULF | ) | |
| INVESTMENTS AND SERVICES | ) | |
| LTD., BLUE MARINE | ) | |
| TECHNOLOGY GROUP, BLUE | ) | |
| MARINE SHIPPING II, S.A. DE C.V., | ) | |
| CALVI SHIPPING C.V., OCEAN | ) | |
| MEXICANA, S.A. DE C.V., HALANI | ) | |
| INTERNATIONAL LTD., SHIPYARD | ) | |
| DE HOOP B.V., HOOP LOBITH | ) | |
| INTERNATIONAL B.V., | ) | |
| WAYPOINT ASSET | ) | |
| MANAGEMENT LLC, ASHMORE | ) | |
| EMERGING MARKETS | ) | C.A. No. 2018-0435-MTZ |
| CORPORATE HIGH YIELD FUND | ) | |
| LIMITED, ASHMORE EMERGING | ) | |
| MARKETS HIGH YIELD PLUS | ) | |
| FUND LIMITED, ASHMORE | ) | |
| EMERGING MARKETS TRI ASSET | ) | |
| FUND LIMITED, ASHMORE | ) | |
| EMERGING MARKETS DEBT AND | ) | |
| CURRENCY FUND LIMITED, | ) | |
| ASHMORE EMERGING MARKETS | ) | |
| SPECIAL SITUATIONS | ) | |
| OPPORTUNITIES FUND LIMITED | ) | |
| PARTNERSHIP, ASHMORE SICAV | ) | |
| EMERGING MARKETS DEBT | ) | |
| FUND, ASHMORE SICAV | ) | |
| EMERGING MARKETS | ) | |
| CORPORATE DEBT FUND, | ) | |
| ASHMORE SICAV EMERGING | ) | |
| MARKETS HIGH YIELD | ) | |
| CORPORATE DEBT FUND, HBK | ) | |

MASTER FUND L.P., ICE 1 EM CLO )
LIMITED, ICE GLOBAL CREDIT )
(DCAM) MASTER FUND LIMITED, )
ICE FOCUS EM CREDIT MASTER )
FUND LIMITED, ICE GLOBAL )
CREDIT ALPHA MASTER FUND )
LIMITED, ICE ORYX ALPHA )
MASTER FUND LIMITED, )
LARRAIN VIAL S.A. SOCIEDAD )
ADMINISTRADORA DE FONDOS )
DE INVERSION, MONEDA )
INTERNATIONAL INC., MONEDA )
LATIN AMERICAN CORPORATE )
DEBT, PADSTOW FINANCIAL )
CORP., MONEDA S.A. )
ADMINISTRADORA GENERAL DE )
FONDOS, MONEDA DEUDA )
LATINOAMERICANA FONDO DE )
INVERSION, MONEDA RENTA CLP )
FONDO DE INVERSION, NORDIC )
TRUSTEE ASA, and )
COÖPERATIEVE RABOBANK U.A., )
)
        Plaintiffs, )
)
     v. )
)
KPMG LLP, KPMG CÁRDENAS )
DOSAL, S.C., and KPMG )
INTERNATIONAL COOPERATIVE, )
)
        Defendants. )
)

**MEMORANDUM OPINION**

Date Submitted:  November 7, 2018
Date Decided:  February 28, 2019

David E. Ross, ROSS, ARONSTAM & MORITZ LLP, Wilmington, Delaware; Terry L. Wit, A. William Urquhart, Juan P. Morillo, Derek L. Shaffer, Lauren H. Dickie, QUINN EMANUEL URQUHART & SULLIVAN, LLP; San Francisco, California and Washington, D.C.; *Attorneys for Plaintiffs*

Kevin R. Shannon, Matthew F. Davis, and Christopher N. Kelly, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Gregory G. Ballard and Jose F. Sanchez, SIDLEY AUSTIN LLP, New York, New York; *Attorneys for Defendant KPMG Cárdenas Dosal, S.C.*

Todd Schiltz, DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Robert A. Scher and Jonathan H. Friedman, FOLEY & LARDNER LLP, New York, New York; *Attorneys for Defendant KPMG, LLP*

Timothy Jay Houseal, Jennifer M. Kinkus, William E. Gamgort, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; Ana C. Reyes, WILLIAMS & CONNOLLY, LLP, Washington, D.C.; *Attorneys for Defendant KPMG International Cooperative*


**ZURN, Vice Chancellor**

The plaintiffs in this negligent misrepresentation case are creditors and bondholders of what was Latin America's largest offshore oil and gas services company, Oceanografía S.A. de C.V., referred to in this decision as OSA. Based in Mexico, OSA had a banking and financial services relationship with Citigroup, Inc., a Delaware company headquartered in New York, and Citigroup's Mexican subsidiaries. Part of that relationship involved an expansive cash advance credit line that Citigroup's Mexican subsidiaries extended to OSA over several years.

OSA allegedly scammed the cash advance facility with years of forged and fraudulent invoices. When Mexican state-owned entities exposed the fraud and Citigroup withdrew its credit line, OSA crumpled into bankruptcy. The plaintiffs seek $1.1 billion in damages from the accounting services firm, KPMG, that audited OSA, Citigroup, and Citigroup's Mexican subsidiaries. They sued three KPMG entities based out of the U.S., Mexico, and Switzerland, respectively. The U.S. entity audited Citigroup's financial statements for the relevant years of 2010 through 2013. The Mexican entity audited certain of the financial statements from OSA and Citigroup's Mexican subsidiaries during those same periods. Both entities are member firms of the Swiss entity, which did not issue any audits. The plaintiffs are not creditors or clients of the defendants, and assert no connection to them other than relying on the defendants' audits and related financial materials.

The plaintiffs originally filed this suit in Delaware's Superior Court. They allege that all three defendants, through a complex web of agency and joint venture liability, negligently failed to catch OSA's frauds in their audits of OSA (Count I), Citigroup's Mexican subsidiaries (Count II), and Citigroup itself (Count III). As a result, the plaintiffs claim that the audits misrepresented OSA's health and status, and allege that they then relied on those misrepresentations in choosing to do business with, or otherwise remain creditors and bondholders of, the doomed company. The defendants all moved to dismiss. After jurisdictional discovery, the Superior Court transferred the case to the Court of Chancery because it lacked subject matter jurisdiction over the plaintiffs' negligent misrepresentation claims. The parties renewed the motions to dismiss in this Court.

I grant the motions to dismiss. This Court lacks personal jurisdiction over the Mexican and Swiss entities, who have not engaged in any Delaware contacts related to the heart of the plaintiffs' claims. For similar reasons, I also conclude that Mexico is the appropriate forum for claims against the Mexican defendant. Delaware can only hear claims against the U.S. defendant. The parties contest which jurisdiction's law governs those claims, but I conclude that the plaintiffs have failed to adequately plead their claims under any of the proposed sources of law. For these and other reasons set out below, I must dismiss the plaintiffs' claims.

## I. BACKGROUND

I draw the relevant facts from the allegations in, and those documents incorporated by reference into, the Complaint.

### A. OSA And Citigroup Engaged In Fraud And OSA's Creditors Sought Relief From The Fraudsters' Auditors.

Non-party OSA was Latin America's largest oil and gas services company, with revenues of approximately $920 million in 2012 and projected to hit approximately $1.6 billion by 2017.[1] OSA's largest client was Mexico's state-owned oil and gas company, non-party Petroleos Mexicanos ("Pemex").[2] The plaintiffs are a collection of OSA's bondholders, creditors, and companies that did business with OSA ("Plaintiffs"). They include shipping companies, bondholders from two bond issuances in 2008 and 2013, and lenders.[3]

Non-party Citigroup is a Delaware corporation, headquartered in New York, that provides banking and financial services. Citigroup and two of its Mexican subsidiaries, non-parties Grupo Financiero Banamex S.A. de C.V. and Banco Nacional de México, S.A. (together, "Banamex"), served as bankers, financial advisors, and credit lenders to OSA.[4]

---

[1] Compl. ¶ 9.

[2] *Id.* ¶ 9.

[3] *Id.* ¶ 46.

[4] *Id.* ¶¶ 1, 11.

In 2008, Citigroup established a credit facility for Pemex contractors, including OSA, through Banamex.[5] OSA obtained cash advances through the credit facility. The advances started with limits of $70 million in 2009 but, by 2014, had ballooned to over $500 million.[6] OSA supported its cash advance requests by submitting invoices or other documentation to Citigroup for services OSA purportedly provided to Pemex.[7] Pemex then paid Citigroup directly for OSA's services based on the invoices OSA submitted to Citigroup.[8] On top of that payment, Citigroup charged OSA interest on the cash advances above Mexico's inter-bank interest rate.[9]

Plaintiffs allege that "[b]eginning as early as 2010 and continuing through February 2014, [OSA] requested at least 166 fraudulent cash advances from Citigroup totaling at least $750 million."[10] Based on these falsified materials, Citigroup advanced cash to OSA far beyond the value of services OSA performed.[11] According to Plaintiffs, OSA and Citigroup worked together to "exploit[] the

---

[5] *Id.* ¶ 221.

[6] *Id.* ¶ 211.

[7] *Id.* ¶¶ 230, 233.

[8] *Id.* ¶ 232.

[9] *Id.* ¶ 253.

[10] *Id.* ¶ 258.

[11] *Id.* ¶¶ 262-63.

4

deficient and non-functioning internal control processes both at [OSA] and Citigroup/Banamex" in a mutually beneficial fraudulent scheme.[12] The alleged result of this complex fraud was simple: because OSA inflated its invoices, (i) OSA got more cash than it needed to fund its work for Pemex, (ii) Pemex paid Citigroup and Banamex more than necessary for the work OSA performed, and (iii) Citigroup and Banamex received interest based on those higher invoices.

In 2013, an arm of the Mexican federal government, the Secretaría de la Función Pública (the "SFP"), investigated the insurance policies that OSA was required to provide to Pemex, found the policies to be insufficient, and banned OSA from entering into new contracts with Pemex for nearly two years.[13] The SFP published its decision on February 11, 2014.[14] Citigroup then launched its own internal investigation, although it continued to provide cash advances to OSA during the interim.[15] During Citigroup's investigation, Pemex uncovered OSA's fraudulent cash advance scheme.[16] On February 28, 2014, Citigroup issued a press release disclosing OSA's plot.[17] On March 1, 2014, Mexican authorities seized OSA and

---

[12] *Id.* ¶ 213.

[13] *Id.* ¶¶ 267-69.

[14] *Id.* ¶ 270.

[15] *Id.* ¶¶ 273-74.

[16] *Id.* ¶ 283.

[17] *Id.* ¶ 283.

its assets.[18]   Later that year, Mexican authorities determined that at least some Banamex employees played a role in the cash advance scheme and fined Banamex approximately $2.3 million.[19]   OSA filed for bankruptcy.[20]

On February 26, 2016, Plaintiffs sued in Delaware's Superior Court.[21]   The defendants are three arms of KPMG, an international accounting services firm. KPMG, LLP ("KPMG US") is a Delaware entity headquartered in New York. KPMG Cárdenas Dosal, S.C. ("KPMG Mexico") is a Mexican entity.   KPMG International Cooperative ("KPMG International")[22] is a Swiss cooperative.   Unlike KPMG US and KPMG Mexico, KPMG International is not an accounting firm and does not perform audits.   Instead, KPMG International serves as an umbrella organization to protect and coordinate the various member firms in the KPMG network.[23]   KPMG US and KPMG Mexico are each member firms of KPMG International.[24]

---

[18] *Id.* ¶¶ 285-86.

[19] *Id.* ¶¶ 291-96.

[20] *Id.* ¶ 2.

[21] *Otto Candies, LLC v. KPMG LLP*, C.A. No. N16C-02-260 PRW CCLD (Del. Super. Ct.) [hereinafter Superior Court Action].

[22] I refer to KPMG US, KPMG Mexico, and KPMG International together as the "Defendants."

[23] Compl. ¶¶ 355-59.

[24] *Id.* ¶¶ 195, 198.

6

KPMG Mexico audited OSA for the years 2010 through 2012 (the "OSA Audits"). KPMG Mexico allegedly assisted with the OSA audit for 2013, but stopped its work because of OSA's exposed fraud.[25] KPMG Mexico has annually audited Banamex since 2009 (the "Banamex Audits"),[26] including as part of the audits of Citigroup's consolidated financial statements (the "Citigroup Audits").[27] KPMG US audited Citigroup for at least the years 2010 through 2013 and generally helmed the Citigroup Audits, although KPMG Mexico performed the Banamex component of those Audits.[28] I refer to the Banamex component of the Citigroup Audits as the "Banamex Component Audits," and the OSA, Banamex, and Citigroup Audits collectively as the "Audits."

Plaintiffs' Complaint alleges three counts of negligent misrepresentation, each against all Defendants, and each mapped to audits performed on players allegedly involved in the cash advance fraud: OSA (Count I), Banamex (Count II), and Citigroup (Count III).[29] Plaintiffs allege that the KPMG entities operated through a complex series of agency relationships, and specifically as a joint venture for the

---

[25] *Id.* ¶¶ 199, 304, 387.

[26] *Id.* ¶ 391. Plaintiffs also allege that KPMG Mexico has been Banamex's auditor since at least 2005. *See id.* ¶ 200.

[27] *Id.* ¶ 391.

[28] *Id.* ¶ 196.

[29] *Id.* ¶¶ 467-520.

Audits.[30] They allege that KPMG International was the principal to KPMG Mexico[31] and that KPMG US, as the leading revenue generator for the entire KPMG network, was the principal to agent KPMG International.[32] Plaintiffs also allege that KPMG US was responsible for all or virtually all of the work KPMG Mexico performed on (i) the Banamex Component Audits, by virtue of KPMG US's status as the lead auditor on the consolidated Citigroup Audits, and (ii) the OSA Audits, by virtue of its principal relationship over KPMG Mexico.[33]

On June 27, 2016, Defendants separately moved to dismiss (the "Motions to Dismiss").[34]

### B. The Superior Court Denied Most Jurisdictional Discovery And Dismissed The Action For Lack Of Equitable Subject Matter Jurisdiction.

Soon after Defendants moved to dismiss, Plaintiffs served jurisdictional discovery on Defendants. On August 19, 2016, Defendants moved for protective

---

[30] *Id.* ¶¶ 351-55.

[31] *Id.* ¶¶ 405-11.

[32] *Id.* ¶¶ 412-23.

[33] *Id.* ¶¶ 424-38.

[34] Each Defendant filed an opening and reply brief, which I refer to as each Defendant's respective "Opening Br." and "Reply Br." Plaintiffs filed an omnibus opposition brief, which I refer to as the "Opposition Br."

orders against the jurisdictional discovery.[35]  The parties agreed to stay briefing on the Motions to Dismiss pending a decision on the protective orders.[36]

On November 9, 2016, the Superior Court granted the protective orders in part.[37]  The Superior Court rejected what Plaintiffs described as "Category 1" jurisdictional discovery: generally, connections between KPMG's Delaware entities and the Audits, and other contacts between the Defendants and Delaware or the U.S.[38]  And the Protective Order narrowed what Plaintiffs described as "Categories 2 and 3" of the jurisdictional discovery, which sought to investigate the relationship between Defendants related to the Audits, and information about the Banamex Component Audits.[39]  The Superior Court permitted discovery to proceed only if such requests

> support a potential claim for specific jurisdiction over KPMG International and Mexico as to their role, if any, in the Banamex audit or the component audit of Banamex as part of the Citigroup audit; seek information concerning the relationship and interaction between the defendants; *and* are specifically limited to conduct in Delaware that precisely gives rise to the claims alleged in the Complaint[.][40]

---

[35] Superior Court Action, Docket Item ("D.I.") 47-49.

[36] Superior Court Action, D.I. 46 at ¶ 4.

[37] Superior Court Action, D.I. 69 at ¶¶ 2-3 [hereinafter Protective Order].

[38] *Id.* ¶ 2.

[39] *Id.* ¶ 3.

[40] *Id.* ¶ 3 (emphasis in original).

Defendants responded to the jurisdictional discovery following the Protective Order, but it soon became clear that the parties disagreed on the permissible scope for that discovery. To facilitate a resolution, the parties agreed to former Chancellor Chandler as a Special Discovery Master. Plaintiffs requested broad discovery, asserting that the Superior Court had specific personal jurisdiction over KPMG Mexico and KPMG International under Delaware's long-arm statute, 10 *Del. C.* § 3104(c). In particular, Plaintiffs asserted that a deep web of joint venture and agency arrangements among the Defendants granted the Superior Court specific personal jurisdiction over the two non-Delaware Defendants through their connections to KPMG US under Sections 3104(c)(1) through (3), and, separately, that KPMG International contracted to insure the other Defendants under Section 3104(c)(6). Germane to both theories, Plaintiffs also interpreted the Protective Order to permit discovery into the consolidated Citigroup Audits because they included the Banamex Component Audits. Defendants opposed discovery on those grounds, and the parties briefed the dispute before the Special Master.

On April 24, 2017, the Special Master issued his final report and recommendation (the "Final Report").[41] Under each of Plaintiffs' theories for personal jurisdiction, the dispute "center[ed] on the extent to which Plaintiffs are

---

[41] Superior Court Action, D.I. 78 [hereinafter Final Report].

entitled to discovery concerning the relationship among the Defendants with respect to the Citigroup audit."[42] The Special Master interpreted the Protective Order to permit discovery only into the Banamex Audits and Banamex Component Audits, not "wholly unrelated aspect[s] of the Citigroup audit."[43] Thus, the Special Master limited any discovery in support of Plaintiffs' theories to the Banamex Audits and Banamex Component Audits.

The Special Master evaluated Plaintiffs' requests for jurisdictional discovery under *Hart Holding Co. Inc. v. Drexel Burnham Lambert Inc.*, which held that "[o]nly where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction."[44] As for Plaintiffs' joint venture and agency theories of personal jurisdiction, he determined that they "could, in appropriate circumstances, serve as a basis for personal jurisdiction,"[45] but barred discovery into those theories after a review of Defendants' discovery responses to date. He explained:

---

[42] *Id.* at 10.

[43] *Id.* at 20-25.

[44] 593 A.2d 535, 539 (Del. Ch. 1991).

[45] Final Report 11.

11

Defendants contend [] there is no relevant jurisdictional act in Delaware to impute to KPMG Mexico or KPMG International under the joint venture/agency theory. I agree. This Court has limited discovery to that which "support[s] a claim for specific jurisdiction," pertains to the "Banamex audit or the component audit of Banamex," and relates to "conduct in Delaware that precisely gives rise to the claims alleged in the Complaint" . . . . The Complaint does not allege that any work relating to Banamex whatsoever was performed in Delaware, and Defendants have confirmed that no such work was performed in Delaware. *Thus, there is no "conduct in Delaware" that falls within the constraints of the Court's Order.* Even assuming that the Defendants formed a joint venture/agency relationship, the agency theory only provides a basis for jurisdiction if there is a relevant jurisdictional contact to impute. . . . *Because Defendants have confirmed that no Banamex-related conduct occurred in Delaware, it is moot to grant additional jurisdictional discovery to support a joint venture/agency theory of jurisdiction.*[46]

Regarding Plaintiffs' theory that KPMG International contracted to insure or acted as surety to parties under Section 3104(c)(6), the Special Master recommended limited jurisdictional discovery into the insurance relationships among the Defendants as related to the Banamex Audits and Banamex Component Audits.[47]

---

[46] *Id.* at 19-27 (citing Protective Order) (emphases added). The Special Master's initial draft report considered and permitted discovery into "any actions taken in Delaware that involve, affect, impact, or relate to the Banamex audit or the component audit of Banamex in any way," and into "the parties' relationship with respect to the Citigroup audit, again, only as it pertains in some way to the Banamex component, to support Plaintiffs' claim [regarding a joint venture]." Superior Court Action, D.I. 80 Ex. 29 at 18. But the Final Report concluded that Plaintiffs could not impute any jurisdictional acts from KPMG US to the other Defendants because Defendants' discovery responses confirmed that no acts related to the Banamex and Banamex Component Audits took place in Delaware.

[47] Final Report 27-30.

Plaintiffs took exception to the Final Report. On July 26, 2017, the Superior Court issued an opinion approving and adopting the Final Report in full. It held that:

> Plaintiffs have made several attempts to establish personal jurisdiction over two foreign corporations and a Delaware corporation using a unique "joint venture" theory. Unfortunately for Plaintiffs, they have failed to establish the requisite nexus between the Defendants to show why this Court should exercise personal jurisdiction over the two foreign entities. The Court is satisfied that the Special Master has properly tailored this particular jurisdictional discovery consistent with the Court's previous order and applicable law. And, as the Special Master pointed out, Plaintiffs still have access to the parties' insurance and indemnity agreements as a tool to establish personal jurisdiction.[48]

Following the Superior Court's order, the parties completed briefing on Defendants' Motions to Dismiss. On April 25, 2018, the Superior Court ruled that it lacked subject matter jurisdiction to hear negligent misrepresentation claims, and permitted Plaintiffs the opportunity to transfer venue to this Court under 10 *Del. C.* § 1902.[49]

On June 13, 2018, Plaintiffs re-filed their complaint in this Court. The parties jointly requested that the Court "rule on the motion to dismiss issues that remain outstanding,"[50] and I heard argument on November 7 (the "Hearing").[51]

---

[48] *Otto Candies, LLC v. KPMG LLP*, 2017 WL 3175619, at *5 (Del. Super. Ct. July 26, 2017) [hereinafter *Superior Court Discovery Order*].

[49] *Otto Candies, LLC v. KPMG LLP*, 2018 WL 1960344, at *4 (Del. Super. Ct. Apr. 25, 2018).

[50] D.I. 2 at 2.

[51] I refer to the hearing transcript as the "Hearing Tr."

13

## C. Plaintiffs' Federal Litigation Against Citigroup Was Dismissed On Grounds Of *Forum Non Conveniens*.

Another front of Plaintiffs' litigation is relevant. Some of the Plaintiffs filed a suit in the U.S. District Court for the Southern District of Florida, alleging violations of 18 U.S.C. §§ 1962(c)-(d), common law fraud, aiding and abetting fraud, conspiracy to commit fraud, and breach of fiduciary duty against Citigroup itself for its conduct related to OSA's fraud. Citigroup moved to dismiss under the doctrine of *forum non conveniens* in favor of Mexico as the forum, or for failure to state a claim.[52]

On June 15, 2018, the District Court dismissed the action under the doctrine of *forum non conveniens*. Under applicable federal standards, the court determined that Mexico was an adequate and available forum;[53] ease of access to evidence supported dismissal because "all of the key players in this dispute—OSA, Pemex, [Banamex], and Citigroup—will be available in Mexico";[54] and the enforceability of a Mexican judgment supported dismissal because Citigroup consented to Mexican

---

[52] *Otto Candies, LLC v. Citigroup, Inc.*, 2018 WL 3008740, at *2 (S.D. Fla. June 15, 2018) [hereinafter *Florida Dismissal Order*].

[53] *Id.* at *3-4.

[54] *Id.* at *6. Because the plaintiffs were concerned with access to U.S.-based proof, the court required that Citigroup make its relevant documents and witnesses available in Mexico.

jurisdiction.[55]  The court also determined that the public interest favored hearing the dispute in Mexico's courts because "this case involves four primary players, three of which [Banamex, OSA, and Pemex] are unquestionably Mexican entities," and Citigroup, "who [was] alleged to have acted in part through its wholly-owned Mexican subsidiary."[56]  As a result, the court concluded that "Mexico clearly has a substantial interest in this case being litigated in Mexico."[57]  With respect to the availability of witnesses and compulsory process, the court again found that Mexico was the more convenient forum.[58]

Co-counsel for Plaintiffs here represented the plaintiffs in the Florida action. Plaintiffs brought this decision to this Court's attention on October 18, noting that the matter was then on appeal.[59]  The parties have not provided the Court with any more updates on the Florida action, and none are apparent from publicly available sources.

---

[55] *Id.* at *7.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] D.I. 68.

## II. ANALYSIS

### A. Standards Of Review And The Law Of The Case

The parties moved to dismiss under Superior Court Rules of Civil Procedure 9(b), 12(b)(1), 12(b)(2), 12(b)(6). The Superior Court resolved the Motions to Dismiss under Rule 12(b)(1). The remaining grounds for the Motions were presented under the analogous rules of this Court.

"When personal jurisdiction is challenged by a motion to dismiss pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant."[60] "The court may consider the pleadings, affidavits, and any discovery of record."[61] Plaintiffs must allege specific facts to support personal jurisdiction where, as here, they have taken jurisdictional discovery.[62]

Rule 12(b)(6) tests whether Plaintiffs have stated a claim. "The standards governing a motion to dismiss for failure to state a claim are well settled: (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court

---

[60] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003).

[61] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008).

[62] *See Reid v. Siniscalchi*, 2014 WL 6589342, at *5 (Del. Ch. Nov. 20, 2014); *Medi-Tec of Egypt Corp. v. Bausch & Lomb Surgical*, 2004 WL 415251, at *2 (Del. Ch. Mar. 4, 2004).

must draw all reasonable inferences in favor of the non-moving party; and (iii) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[63]

Rule 9(b) tests the sufficiency of Plaintiffs' claims relating to "all averments of fraud or mistake," and demands that "the circumstances constituting fraud or mistake [] be stated with particularity."[64] The parties dispute whether Rule 9(b) applies to Plaintiffs' claims of negligent misrepresentation, sometimes known as equitable fraud.[65] Plaintiffs rely mainly on *Carello v. PricewaterhouseCoopers LLP*, where the Superior Court considered the standard for pleading negligence on a case-by-case basis and found that, on the record before it, negligence could be pled with less particularity because "the facts [laid] more in the knowledge of the opposite party, than of the party pleading."[66] Yet Delaware courts routinely apply the more

---

[63] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (quoting *Kofron v. Amoco Chemicals Corp.*, 441 A.2d 226, 227 (Del. 1982)).

[64] Ct. Ch. R. 9(b). "Nevertheless, the burden remains on the movant to demonstrate that the plaintiff has not met the requirements of Rules 9(b)[.]" *London v. Tyrrell*, 2008 WL 2505435, at *4 (Del. Ch. June 24, 2008).

[65] *PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *13 (Del. Ch. Apr. 30, 2018).

[66] *Carello v. PricewaterhouseCoopers LLP*, 2002 WL 1454111, at *8 (Del. Super. Ct. July 3, 2002) (quoting *Phillips v. Del. Power & Light Co.*, 194 A.2d 690, 697 (Del. Super. Ct. 1963)); Opposition Br. 18-19; *see also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 146 (Del. Ch. 2003) (applying the "less particularity" standard to negligent misrepresentation claims, among others, where the allegations under question dealt with the knowledge and intent of the parties).

stringent Rule 9(b) standard to negligent misrepresentation claims,[67] as a "negligent misrepresentation claim must be stated with the same [particularity] required for fraud."[68] Because Plaintiffs' claims hinge on alleged misrepresentations in audits and related materials they claim to have relied on but later learned to be false, I do not apply the less particularity standard to the "circumstances constituting fraud or mistake."[69] Plaintiffs must identify with particularity the representations they relied on that they now believe, with the benefit of hindsight, are false or incomplete.[70] By

---

[67] *See PR Acquisitions, LLC*, 2018 WL 2041521, at *13 (applying Rule 9(b) to negligent misrepresentation claims); *Fortis Advisors LLC v. Dialog Semiconductor PLC*, 2015 WL 401371, at *9 (Del. Ch. Jan. 30, 2015) ("Because [plaintiff] failed to plead its common law fraud claim with the requisite particularity, its negligent misrepresentation claim fails for the same reason."); *Underwriters at Lloyd's v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 2813774, at *5 (Del. Ch. Feb. 8, 2007) ("The Court is concerned by the fact that Plaintiffs' third amended complaint still does not set forth the specific allegations that form the basis for an aspect of Underwriters' claim against Defendants for negligent misrepresentation. Court of Chancery Rule 9(b) requires that fraud be pled with particularity. This rule almost certainly extends to negligent misrepresentation (equitable fraud) as well, and it is highly doubtful that mere oblique references to documents attached to a complaint as exhibits suffice to meet this particularity requirement.").

[68] *PR Acquisitions, LLC*, 2018 WL 2041521, at *13; *see also Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) ("To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations.").

[69] Ct. Ch. R. 9(b).

[70] *See generally MHS Capital LLC v. Goggin*, 2018 WL 2149718, at *10 (Del. Ch. May 10, 2018) (declining to apply "less particularity" standard under Rule 9(b) where "[t]he lack of prior discovery poses no impediment to a plaintiff's ability to plead the circumstances constituting fraud. . . . [because] [a]fter all, the plaintiff was there").

18

contrast, information such as Defendants' mental states and what Defendants knew about their clients' involvement in any fraud "may be averred generally."[71]

Finally, I proceed in light of the law of the case as determined by the Superior Court. "The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."[72] The parties did not dispute the viability of the Superior Court's jurisdictional rulings until the Hearing. Both sides completed briefing on the Motions to Dismiss after the Superior Court adopted the Special Master's Final Report. And both sides asked this Court to "rule on the motion to dismiss issues that remain outstanding" upon transfer to this venue, and acknowledged the Superior Court's rulings.[73] But during the Hearing on the Motions to Dismiss, Plaintiffs' counsel suggested for the first time that I could disregard, or perhaps review *de novo*, the Superior Court's rulings on personal jurisdiction.[74] While our Supreme Court has held that courts may reconsider the law of the case where it is "clearly wrong, produces an injustice or should be revisited because of

---

[71] Ct. Ch. R. 9(b).

[72] *Kenton v. Kenton*, 571 A.2d 778, 784 (Del. 1990); *see also Gannett Co. v. Kanaga*, 750 A.2d 1174, 1181 (Del. 2000) ("The law of the case doctrine, like the *stare decisis* doctrine, is founded on the principle of stability and respect for court processes and precedent.").

[73] D.I. 2 at 2.

[74] Hearing Tr. 104-106; 120-21.

changed circumstances,"[75] Plaintiffs waived any arguments that this Court should depart from the law of this case.[76]

**B.     The Court Lacks Personal Jurisdiction Over KPMG Mexico And KPMG International.**

KPMG Mexico and KPMG International are neither Delaware companies nor U.S.-based companies.  Both moved to dismiss for lack of personal jurisdiction. "Personal jurisdiction refers to the court's power over the parties in the dispute."[77] To test personal jurisdiction, "[t]he court engages in a two-step analysis: the court must first determine that service of process is authorized by statute and then must determine that the exercise of jurisdiction over the nonresident defendant comports with traditional due process notions of fair play and substantial justice."[78]  Plaintiffs

---

[75] *Gannett Co.*, 750 A.2d at 1181.

[76] *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").  Plaintiffs' statements at the Hearing do not meet the burden outlined in *Gannett*.  *See Gannett Co.*, 750 A.2d at 1181.  In addition, Plaintiffs stated at the hearing that they "haven't made [the] argument" that "the lack of subject matter jurisdiction in the Superior Court should void everything" from those proceedings. Hearing Tr. 104.  Although the parties have not briefed the issue, this Court has in the past deferred to prior decisions of a case transferred under Section 1902.  *See Allen v. Liberty Mut. Fire Ins. Co.*, 2010 WL 1839276, at *2 (Del. Ch. Apr. 28, 2010) ("It is unclear to me to what extent that issue was in play and fully addressed in the Superior Court action. If it was fully addressed, plaintiffs could appeal [that] decision to the Delaware Supreme Court."); *accord* Charles Alan Wright, *et al.*, 15 *Federal Practice & Procedure, Jurisdiction* § 3867 (4th ed.) (noting that in the federal multi-district litigation context, "[r]ulings made by the transferor court remain in effect in the transferee court").

[77] *Genuine Parts Co. v. Cepec*, 137 A.3d 123, 129 (Del. 2016).

[78] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

20

allege that Delaware's long-arm statute, Section 3104(c), provides the following potential grounds for personal jurisdiction:[79]

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
>
> (1) Transacts any business or performs any character of work or service in the State;
>
> (2) Contracts to supply services or things in this State;
>
> (3) Causes tortious injury in the State by an act or omission in this State; . . . [or]
>
> (6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Sections 3104(c)(1), (2), (3), and (6) outline several ways Delaware courts may exercise specific personal jurisdiction under the long-arm statute. Because they relate to specific jurisdiction, "there must be a nexus between" the Delaware act "and the cause of action asserted in the lawsuit."[80] "Section 3104 requires claims to 'arise from,' not merely be 'related to,' conduct in Delaware."[81] I analyze Plaintiffs'

---

[79] *See* Opposition Br. 93 n.194.

[80] *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr. U/A/D/ June 21, 2002*, 2017 WL 3575712, at *6 (Del. Ch. Aug. 18, 2017), *aff'd sub nom. Marion #2-Seaport Tr. u/a/d June 21, 2002 v. Terramar Retail Centers, LLC*, 184 A.3d 1290 (Del. 2018).

[81] *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *11 (Del. Ch. Oct. 31, 2013).

21

allegations of jurisdiction under Sections 3104(c)(1) through (3) first, and then turn to Section 3104(c)(6). Ultimately, I find that this Court lacks jurisdiction over KPMG Mexico and KPMG International because Plaintiffs have not satisfied their burden under the long-arm statute. For that reason, I do not reach the parties' due process arguments.

### 1. KPMG Mexico And KPMG International Did Not Commit Sufficient Acts In Delaware.

Plaintiffs allege that Defendants transacted business in Delaware, performed work or services in Delaware, contracted to supply services in Delaware, caused a tortious injury to someone in Delaware by an act or omission in Delaware, or some combination thereof, through a series of agency and joint venture relationships.[82] Plaintiffs allege that KPMG International is a global parent organization for the KPMG network,[83] KPMG Mexico is an agent of KPMG International,[84] and KPMG US controls KPMG International (and, by extension, KPMG Mexico).[85] Plaintiffs also allege that Defendants are part of a joint venture and "act as both principals and

---

[82] 10 *Del. C.* § 3104(c)(1)-(3). The parties vigorously dispute the nuances of Plaintiffs' joint venture and agency theories, as well as which law—Delaware, New York, or Mexico—applies to the issue. Because I find that Plaintiffs failed to establish contacts under the long-arm statute, I need not reach these questions.

[83] Compl. ¶¶ 355-85.

[84] *Id.* ¶¶ 386-411.

[85] *Id.* ¶¶ 412-23.

agents for one another."[86]  These allegations are key to Plaintiffs' theory of personal jurisdiction over KPMG Mexico and KPMG International: Section 3104 requires Delaware acts, but permits an agent, here KPMG US, to commit those acts on behalf of a foreign principal.[87]

The Superior Court's personal jurisdiction rulings are fatal to this Court's jurisdiction over KPMG Mexico and KPMG International under Sections 3104(c)(1) through (3).  The standard for jurisdictional discovery is low: "[o]nly where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction."[88]  Invoking that standard, the Superior Court narrowed the potential nexus for specific personal jurisdiction to the Banamex Audits and the Banamex Component Audits.[89]  It granted the Protective Order against much of Plaintiffs' jurisdictional discovery[90] because "any attempts for jurisdictional discovery on

---

[86] Opposition Br. 51.

[87] 10 *Del. C.* § 3104 ("As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent . . . .").

[88] *Hart Holding Co. Inc.*, 593 A.2d at 539.

[89] Protective Order ¶¶ 2-3.

[90] *See supra* at 9.

Citigroup and any other audits [other than the Banamex Audits and Banamex Component Audits] would be too tenuous to comport with Delaware's long-arm statute."[91] The Superior Court ruled that (i) Plaintiffs' broader allegations of connections between KPMG's Delaware entities and the Audits, and other contacts between the Defendants and Delaware or the U.S., and (ii) Plaintiffs' request to investigate the relationship generally between Defendants related to all the Audits, all failed to clear the low hurdle for jurisdictional discovery.[92]

The only jurisdictional hook that the Superior Court did not discard was "a potential claim for specific jurisdiction over KPMG International and Mexico as to their role, if any, in the [Banamex Audits or Banamex Component Audits] . . . [regarding] the relationship and interaction between the defendants . . . [as] specifically limited to conduct in Delaware that precisely gives rise to the claims alleged in the Complaint."[93] Because the Superior Court rejected Plaintiffs' allegations of Delaware contacts in the context of the broader Citigroup Audits and OSA Audits, and in view of the low bar for jurisdictional discovery,[94] those

---

[91] *Superior Court Discovery Order*, 2017 WL 3175619, at *4.

[92] Protective Order ¶¶ 2-3.

[93] *Id.* ¶ 3.

[94] *Superior Court Discovery Order*, 2017 WL 3175619, at *5; *see also Degregorio v. Marriott Int'l, Inc.*, 2018 WL 3096627, at *7 (Del. Super. Ct. June 20, 2018) ("The general rule is '[w]here the plaintiff's claim is not clearly frivolous, the [] court should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden.'")

24

allegations cannot now satisfy Plaintiffs' greater burden under Rule 12(b)(2) at this stage.[95] Any nexus for specific jurisdiction must therefore be sourced in the Banamex Audits or the Banamex Component Audits.

---

(quoting *Hart Holding Co. Inc.*, 593 A.2d at 539)). The Superior Court made its determinations in light of the standard that plaintiffs ordinarily receive jurisdictional discovery unless their claims are clearly frivolous. *See* Superior Court Action, D.I. 67 at 56-58, 69. Under that standard, and balancing Plaintiffs' personal jurisdiction theories against the burdens to Defendants, the Superior Court (i) denied the motion for a protective order in part because not all of Plaintiffs' claims were frivolous, and (ii) granted the motion for a protective order against all requests other than a narrow subset arising from the Banamex and Banamex Component Audits. *See id.* at 67-71. I read the Superior Court's Protective Order as denying discovery into all allegations that it believed failed to meet the low standard for jurisdictional discovery, *i.e.*, that were clearly frivolous. *See Superior Court Discovery Order*, 2017 WL 3175619, at *4-5 (later explaining that "any attempts for jurisdictional discovery on Citigroup and any other audits [other than the Banamex Audits and Banamex Component Audits] would be too tenuous to comport with Delaware's long-arm statute," and that Plaintiffs "ha[d] failed to establish the requisite nexus between the Defendants to show why this Court should exercise personal jurisdiction over the two foreign entities").

[95] Where Plaintiffs have failed to meet the lower standard for jurisdictional discovery, they cannot meet a greater burden under Rule 12(b)(2). Delaware courts have often ruled that allegations failing to meet the standard for jurisdictional discovery also warrant dismissal under Rule 12(b)(2). *See, e.g.*, *EBP Lifestyle Brands Holdings, Inc. v. Boulbain*, 2017 WL 3328363, at *4 n.21, *7 n.34 (Del. Ch. Aug. 4, 2017); *In Matter of Dissolution of Arctic Ease, LLC*, 2016 WL 7174668, at *3 n.50, *4-5 (Del. Ch. Dec. 9, 2016); *In re Asbestos Litig.*, 2012 WL 1409397, at *2 (Del. Super. Ct. Jan. 10, 2012); *Picard v. Wood*, 2012 WL 2865993, at *2 (Del. Ch. July 12, 2012); *cf. In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *4 n.46 (Del. Ch. Oct. 16, 2013) (after finding claims not colorable on a motion to expedite, addressing those claims on the "higher" standard of Rule 12(b)(6) only because of plaintiffs' amendments to their complaint following the findings on colorability); *Current v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 2009 WL 530766, at *4 (W.D. Ky. Mar. 3, 2009) ("The court having . . . determined that the complaint as framed at the time of removal failed to allege even a 'colorable claim' . . . finds that the complaint likewise fails to state a claim upon which relief may be granted and the action must be dismissed as to him.").

But when the Special Master evaluated the jurisdictional discovery related to those Audits,[96] he found that additional jurisdictional discovery would be moot because "Defendants have confirmed [by their discovery responses] that no Banamex-related conduct occurred in Delaware," as would be required for jurisdiction under Section 3104(c)(1) through (3).[97] The Superior Court adopted that ruling[98] and found that while "Plaintiffs have made several attempts to establish personal jurisdiction over [the foreign Defendants] using a unique 'joint venture' theory. . . . they have failed to establish the requisite nexus between the Defendants to show why this Court should exercise personal jurisdiction over the two foreign entities" under Sections 3104(c)(1) through (3).

Read together, these rulings preclude personal jurisdiction over KPMG Mexico and KPMG International. Plaintiffs were denied jurisdictional discovery as to all claims except the interaction among Defendants in the Banamex Audits and Banamex Component Audits.[99] The Special Master then rejected any further discovery into those interactions, finding discovery revealed a lack of Delaware

---

[96] The Special Master explained that the "Complaint at its core [] is focused on KPMG Mexico's alleged failures with respect to Banamex," and that the "crux of the Complaint is that [OSA] become reliant on cash advances provided by Banamex, and used fraudulent means to obtain those advances." Final Report 23.

[97] *Id.* at 27.

[98] *Superior Court Discovery Order*, 2017 WL 3175619, at *5.

[99] *See* Protective Order ¶¶ 2-3.

contacts sustaining specific personal jurisdiction.[100]  And the Superior Court, adopting the Special Master's determinations and recommendations, found that Plaintiffs had not established personal jurisdiction over the foreign Defendants through any of its theories under Sections 3104(c)(1) through (3).[101]

As explained above, these rulings are the law of the case.[102]  I decline to revive legal theories the Superior Court rejected as "clearly frivolous."[103]  I also decline to ignore the Superior Court's factual finding that no Banamex-related conduct occurred in Delaware.  And even if the Superior Court had not rejected these theories, Plaintiffs would fail to satisfy Delaware's long-arm statute.  The only Delaware connections that Plaintiffs offer, other than the incorporation of some Plaintiffs, relate to the Citigroup Audits.[104]  But all of Plaintiffs' claims relating to the Citigroup Audits arise out of the Banamex Component Audits.  Plaintiffs have provided no conceivable reason why creditors and bondholders of OSA would, or

---

[100] *See generally* Final Report.  The Special Master permitted jurisdictional discovery into Plaintiffs' theories under Section 3104(c)(6) with respect to the Banamex Audits and Banamex Component Audits.  *See id.* at 27-30.

[101] *Superior Court Discovery Order*, 2017 WL 3175619, at *5.

[102] *See supra* at 19-20.

[103] *See Degregorio*, 2018 WL 3096627, at *7.

[104] Opposition Br. 86-87, 97 (citing as substantial Delaware contacts that (i) Delaware is the place of incorporation for several Plaintiffs, KPMG US, and Citigroup, (ii) Citigroup has "operations" in Delaware, and (iii) KPMG Mexico participated in the Citigroup Audits through the Banamex Component Audits).

even could, have relied on the non-Banamex portions of the consolidated Citigroup Audits for investment and business decisions relating to OSA.[105] The non-Banamex portions of the Citigroup Audits thus cannot serve as the nexus for specific personal jurisdiction. As for the Banamex Audits and Banamex Component Audits, I agree with the rulings by the Special Master and Superior Court that no Banamex-related conduct occurred in Delaware, such that Plaintiffs failed to establish an appropriate nexus for long-arm jurisdiction over claims arising from those Audits. And as for jurisdiction based on the OSA Audits, I find that Plaintiffs fail to allege that any work related to those audits was performed in Delaware.

Plaintiffs "have failed to establish the requisite nexus between the Defendants to show why this Court should exercise personal jurisdiction over the two foreign entities."[106] I conclude that this Court lacks personal jurisdiction over the foreign Defendants under Sections 3104(c)(1) through (3).

### 2. KPMG Mexico And KPMG International Have Not Contracted To Insure Under Section 3104(c)(6).

Plaintiffs also assert that this Court has personal jurisdiction over the foreign Defendants under Section 3104(c)(6), which grants jurisdiction over nonresidents

---

[105] At the Hearing, counsel for KPMG Mexico noted that Plaintiffs have asserted no portion of the Citigroup Audits, other than the Banamex Component Audits, as a basis for liability. *See* Hearing Tr. 24-25. Plaintiffs have not sufficiently alleged that any other portion of the Citigroup Audits support liability.

[106] *Superior Court Discovery Order*, 2017 WL 3175619, at *5.

28

who "[c]ontract[] to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing."[107]   They argue that KPMG International requires its member firms, including KPMG US, to participate in a professional indemnity and insurance program and other insurance arrangements, and that the Audits were performed by firms subscribed to those programs and arrangements.[108]  Plaintiffs claim that KPMG International, and by imputation KPMG Mexico, thus "contract[ed] to insure" under Section 3104(c)(6).[109]

The Superior Court permitted jurisdictional discovery to go forward on this claim.[110]  That discovery confirmed that neither KPMG International nor KPMG Mexico insures KPMG US for anything related to this action.[111]   Accordingly,

---

[107] 10 *Del. C.* § 3104(c)(6).

[108] Compl. ¶ 371; Opposition Br. 100-02.

[109] Although the Opposition Brief asserts that KPMG International contracted to insure and act as surety under the statute, Plaintiffs abandoned the surety argument at the hearing. Opposition Br. 100-01.  In response to a question from the Court asking "in what way [KPMG International is] acting as a surety," counsel represented that Plaintiffs "don't think [KPMG International is] acting as a surety" and have not "alleged that," and that Plaintiffs instead "relied on" the insurance portion of Section 3104(c)(6).  Hearing Tr. 110-11

[110] *Superior Court Discovery Order*, 2017 WL 3175619, at *5.  The discovery was limited to insurance agreements among the Defendants applicative to the Banamex Audits and Banamex Component Audits.  Final Report 29-30.

[111] KPMG International Reply Br. 5.

Plaintiffs rely on Article 16.1 of KPMG International's governing statutes, which states that "each Member shall participate in and comply with the terms and conditions of the professional indemnity insurance program as approved by [KPMG International] from time to time."[112]  Plaintiffs argue that KPMG International must approve of, and perhaps sign on to, certain of those insurance programs, and that KPMG International may even supply the third-party insurance program itself.[113] The parties disagree about the specifics, but I need not reach those.

The issue before me is whether these arrangements qualify as "contract[ing]" to insure under the long-arm statute.  Delaware courts have yet to address the issue.[114]

---

[112] Opposition Br. Ex. C at 14.

[113] Hearing Tr. 107-10.

[114] *See id.* at 110 (Plaintiffs stating that "[a]dmittedly, there's not been a case that has come up that has looked at [whether requiring members of an organization to arrange for insurance qualifies as contracting to insure under Section 3104(c)(6)]").  Plaintiffs' proffered cases fail to address the issue because they involved defendants acting as direct insurers or guarantors. *See Smack v. Hayden*, 2003 WL 21213398, at *3 (Del. Super. Ct. May 7, 2003) ("[The defendant] insured Plaintiff's employer for workers' compensation liability and Plaintiff's employer engaged in work within the State of Delaware."); *Summit Inv'rs II, L.P. v. Sechrist Indus., Inc.*, 2002 WL 31260989, at *3-5 (Del. Ch. Sept. 20, 2002) (in case involving co-obligors of Delaware entity contract, not reaching the 3104(c)(6) analysis because of due process concerns); *Gunton Corp. v. KNZ Const., Inc.*, 1999 WL 744423, at *2 (Del. Super. Ct. July 30, 1999) ("The construction project occurred in Delaware and the building materials were delivered to the Delaware site. The obligation to pay for these materials arose upon their delivery in Delaware. The Individual Defendants executed a personal guaranty of that very obligation."); *Satellite Fin. Planning Corp. v. First Nat. Bank of Wilmington*, 1987 WL 7189, at *2 (D. Del. Feb. 5, 1987) ("[The proposed third-party defendant was the guarantor of the agreements at issue in this case.").

> When construing a statute, Delaware courts must first determine whether the statute is ambiguous. A statute is ambiguous if it is susceptible of two or more reasonable interpretations, or if a literal reading of the statutory language would lead to an unreasonable or absurd result not contemplated by the legislature. If the statute is determined to be unambiguous, then there is no room for judicial interpretation and the plain meaning of the statutory language controls.[115]

Section 3104(c)(6) provides that those who "contract to insure . . . any person, property, risk, contract, obligation or agreement located, executed or to be performed within" Delaware cannot escape the purview of this state's courts, unless those parties agree otherwise in writing.[116] This statute is not ambiguous. A plain reading requires that the party allegedly subject to jurisdiction contract *to provide* insurance. If a company insures a matter in Delaware that inspires a claim, it must be available to be brought to account.[117]

The origin of the statute confirms this reading. "Delaware's long-arm statute . . . is modeled after the Uniform Interstate and International Procedure Act, a 'single act' statute which allows jurisdiction to be imposed on a non-resident defendant on the basis of a single transaction in, or contact with, the forum state."[118] "Under the

---

[115] *Lawson v. State*, 91 A.3d 544, 549 (Del. 2014) (internal quotations and citations omitted).

[116] 10 *Del. C.* § 3104(c)(6).

[117] *See Smack*, 2003 WL 21211398, at *3-4.

[118] *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 1991 WL 190313, at *1 (Del. Super. Ct. Sept. 10, 1991).

Uniform Interstate and International Procedure Act, a court is empowered to exercise jurisdiction over a person or a corporation acting directly or by an agent as to a claim or cause of action arising from, *inter alia*, *issuance of insurance policies* covering any person, property, or risk located within the state."[119]   Indeed, in practice, Delaware courts have typically applied Section 3104(c)(6) to obtain jurisdiction over insurers for claims regarding matters insured in Delaware.[120]

Plaintiffs do not assert that KPMG International insured anything in Delaware, much less that their claims arose out of any Delaware risk insured by KPMG International.  Plaintiffs' attempt to extend Section 3104(c)(6) cuts against the statute's plain meaning and would permit companies, without any other Delaware contacts, to be haled into Delaware courts for directing that their Delaware subsidiaries obtain insurance.  Section 3104(c)(6) is a specific jurisdiction statute

---

[119] Steven Plitt, *et al.*, 16 *Couch on Ins.* § 231:91 (Supp. 2018) (emphasis added).

[120] *See, e.g.*, *Smack*, 2003 WL 21211398, at *3 (where plaintiff sued employer and employer's insurer for work-related injury, finding personal jurisdiction over employer's insurer under Section 3104(c)(6)); *Durant v. New Jersey Auto. Full Ins. Ass'n*, 1995 WL 413427, at *1 (Del. Super. Ct. June 9, 1995) (finding personal jurisdiction over New Jersey automobile insurer that insured New Jersey resident who was involved in an automobile accident in Delaware because the insurer "at the time they entered the contract knew they were insuring a risk that could be performed in the state of Delaware," and plaintiff was covered by the insurance arrangement in Delaware); *Hoechst Celanese Corp.*, 1991 WL 190313, at *2 (finding personal jurisdiction over third-party complaint against insurer despite arbitration agreement between insured and insurer); *see also* Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[a][1] (2d ed. Supp. 2018) ("[Section 3104(c)(6)] confers jurisdiction over an insurer who insures a risk that can be performed in the state of Delaware.").

and does not permit such a gap between the conduct underlying the claim and the conduct justifying jurisdiction.[121]

The situation here falls far afield of Section 3104(c)(6). Under the heightened pleading burden that accompanies jurisdictional discovery,[122] Plaintiffs have failed to show that the foreign Defendants insured the Audits. KPMG International's mandate for member firms to acquire a generalized professional indemnity insurance policy, even if KPMG International must then approve of that policy, does not render it either an insurer or insured for anything related to the Audits. I decline to adopt Plaintiffs' expansive reading that a company's requirement that its member firms be insured is a "contract[] to insure" under Section 3104(c)(6). Nor is it clear to me that KPMG International, by requiring that KPMG US arrange for an indemnity insurance program, "engaged in sufficient 'minimum contacts' with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice."[123] This Court lacks personal jurisdiction over the foreign Defendants.

---

[121] *See Republic Envtl. Sys., Inc. v. RESI Acquisition (Delaware) Corp.*, 1999 WL 464521, at *2 (Del. Super. Ct. May 28, 1999) ("[Defendant] therefore acted as a surety for a person with a presence within the State, an action giving rise to specific jurisdiction under Section (c)(6)."); *1st Source Bank v. Merritt*, 759 F. Supp. 2d 505, 509 (D. Del. 2011) (interpreting *Republic Environmental Systems* to find specific personal jurisdiction under Section 3104(c)(6)).

[122] *See Siniscalchi*, 2014 WL 6589342, at *5.

[123] *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005).

## C. Delaware Is A *Forum Non Conveniens* For KPMG Mexico.

KPMG Mexico moved for dismissal under the doctrine of *forum non conveniens*. "The Latin words '*forum non conveniens*' mean 'forum not agreeing,'" and the doctrine permits this Court to dismiss or stay litigation when the defendant shows a sufficient burden to litigating in the plaintiff's chosen forum.[124] My ruling here applies only to KPMG Mexico.[125]

The parties dispute which standard of *forum non conveniens* applies. There are three potential standards:

---

[124] *Aranda v. Philip Morris USA Inc.*, 183 A.3d 1245, 1249 (Del. 2018).

[125] "[T]here is no requirement that all defendants join a *forum non conveniens* motion." *Hupan v. All. One Int'l, Inc.*, 2015 WL 7776659, at *10 (Del. Super. Ct. Nov. 30, 2015), *aff'd sub nom. Aranda*, 183 A.3d 1245. The other two Defendants elected not to brief the issue in either their Opening or Reply briefs. That choice appears deliberate. Although Defendants have general language in their briefs incorporating the other Defendants' arguments, KPMG US's counsel represented that "KPMG [US] (like KPMG International) has not moved to dismiss on this ground" and it "[does] not dispute that [Plaintiffs'] claims against KPMG [US] should be resolved in Delaware." Opposition Br. Ex. A.

> [A] first-filed Delaware case with no case pending elsewhere (the *Cryo-Maid* test);[126] a second-filed Delaware case with another first-filed case pending elsewhere (the *McWane* test);[127] and a hybrid recently addressed by our [Supreme] Court in *Gramercy*[128]—a later-filed Delaware case after another jurisdiction had dismissed a first-filed case for *forum non conveniens*. All these scenarios call upon the courts to apply, in one form or another, the same *forum non conveniens* factors. What changes is the strength of the presumptions applied.[129]

KPMG Mexico asserts that *McWane* applies. Here, however, there is no other first-filed pending action against KPMG. There are actions arising out of the same underlying allegations of fraud, and some were filed by Plaintiffs,[130] but none involve these defendants.[131] As a result, the *Cryo-Maid* test applies.

---

[126] *Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681 (Del. Ch. 1964), *overruled in part on other grounds by Pepsico, Inc. v. Pepsi-Cola Bottling Co. of Asbury Park*, 261 A.2d 520 (Del. 1969).

[127] *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970).

[128] *Gramercy Emerging Markets Fund v. Allied Irish Banks, P.L.C.*, 173 A.3d 1033 (Del. 2017).

[129] *Aranda*, 183 A.3d at 1250-51.

[130] *See Florida Dismissal Order*, 2018 WL 3008740; *see also* Opposition Br. 75 (describing two actions in Mexico by Plaintiffs or their affiliates related to the OSA fraud).

[131] Under the *McWane* doctrine, "Delaware courts' discretion to dismiss or stay should be exercised freely when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues." *In re Knowledge Crossing LLC*, 2015 WL 4760207, at *1 (Del. Ch. May 29, 2015).

KPMG Mexico asserts that Mexico is the appropriate forum for Plaintiffs' claims because of the burden it faces to litigate in Delaware.[132]  The Court evaluates that burden under six factors: "(1) the relative ease of access to proof; (2) the availability of a compulsory process for witnesses; (3) the possibility to view the premises, if appropriate;[133] (4) all other practical problems that would make the trial easy, expeditious, and inexpensive; (5) whether the controversy is dependent upon Delaware law, which the courts of this State should decide rather than those of another jurisdiction; and (6) the pendency or non-pendency of a similar action in another jurisdiction."[134]  "[F]or dismissal to be granted, the *Cryo-Maid* factors must weigh overwhelmingly in favor of the defendant."[135]

KPMG Mexico has shown overwhelming hardship from litigation in Delaware.  Because this conclusion is in the alternative to dismissal for lack of personal jurisdiction, I do not direct the parties at this time for an appropriate order or impose any conditions on this particular ruling.

---

[132] Hearing Tr. 34 ("Our position is well, actually there's only one available forum.  It's Mexico.").

[133] The parties agree that this factor is neutral in the analysis.  *See* KPMG Mexico Opening Br. 12; Hearing Tr. 141.

[134] *Aranda*, 183 A.3d at 1251.

[135] *Gramercy Emerging Markets Fund*, 173 A.3d at 1037 (internal quotations and citations omitted).

### 1. Virtually All Proof And Witnesses Are In Mexico.

The ease of access to proof and witnesses favors Mexico.  There are three Defendants here, but a host of other important players bear on Plaintiffs' litigation. To succeed on their claims, Plaintiffs will have to prove connections between the underlying OSA fraud, Banamex, Citigroup, and the Defendants.[136]  Defendants' defense will rely on contesting those same factual issues.

"As Plaintiffs will necessarily be required to establish that the underlying fraud between OSA, Pemex, and Banamex actually occurred, it would be a fiction to accept Plaintiffs' [] contention that the only witnesses needed to try this case are the . . . employees" of Defendants.[137]  KPMG Mexico, OSA, Pemex, and Banamex are all more available in Mexico than Delaware.  And Citigroup consented to jurisdiction in Mexico following the Florida action.[138]  Jurisdictional discovery also revealed that Defendants performed no work on the crucial Banamex Audits or Banamex Component Audits in Delaware.[139]  I agree with the U.S. District Court for the Southern District of Florida that the "presence of all of the key players under the

---

[136] "The crux of the Complaint is that [OSA] become reliant on cash advances provided by Banamex, and used fraudulent means to obtain those advances."  Final Report 23.

[137] *Florida Dismissal Order*, 2018 WL 3008740, at *7.

[138] *Id.* at *4.

[139] *See Hupan*, 2015 WL 7776659, at *5-6 (finding factor supported dismissal where necessary elements of defense relied on foreign discovery).

jurisdiction of the Mexican courts means that the parties will not need to resort to the costly and time-consuming process of obtaining documents and testimony through letters rogatory and the Hague Convention as would be required if the case was litigated in the United States."[140]

Virtually all tangible aspects of this case are in Mexico. To the limited extent that Plaintiffs claim there are factual issues in places other than Mexico, they are most likely in Switzerland (KPMG International's headquarters) or New York (KPMG US's headquarters), not Delaware.

### 2. Practical Problems Weigh Against Litigation In Delaware.

"[I]n cases where it is appropriate, a trial court may weigh the efficient administration of justice and analogous considerations under the rubric of" this factor.[141] This matter concerns a large fraud in Mexico by a Mexican company that defrauded one Mexican state entity and was discovered by another Mexican state entity. Plaintiffs allege that a Mexican Defendant should have alerted investors to this fraud through their audits of largely Mexican companies and operations. As in *Aranda*, "Delaware has no real connection to this dispute except for [one of] the

---

[140] *Florida Dismissal Order*, 2018 WL 3008740, at *6.

[141] *Martinez v. E.I. DuPont de Nemours & Co.*, 86 A.3d 1102, 1113 (Del. 2014) ("*Martinez II*").

[defendant's] place of incorporation."[142]  Delaware courts "should consider, on a case-by-case basis, whether the court's resources should be deployed to resolve cases with little connection to Delaware."[143]  "Moreover, the policy issue[s] underlying this case implicate[] important interests of [Mexico] itself" because of the nature of the fraud and its impact on Mexican industries.[144]

This factor favors dismissal.[145]  Because KPMG Mexico is the only party moving for dismissal under *forum non conveniens*, I do not address Plaintiffs' argument that Mexico is not an adequate available forum because of Mexico's potential lack of jurisdiction over the other Defendants.

### 3.    Delaware Law May Govern The Controversy.

In section D of this opinion, I conclude that Delaware law, as the law of the forum, applies to claims against KPMG US because there are no conflicts between the proposed jurisdictions of Delaware, New York, and Mexico.  If the claims against KPMG Mexico were to be litigated in Delaware, the same analysis might compel applying Delaware law as the law of the forum with no conflict.  Were this

---

[142] *Aranda*, 183 A.3d at 1253.

[143] *Id.*

[144] *Martinez II*, 86 A.3d at 1107.

[145] I note the Supreme Court's guidance that "[t]his public interest factor will seldom, in isolation, be dispositive of whether dismissal on the grounds of *forum non conveniens* is warranted."  *Id.* at 1113.

case brought in Mexico, Delaware law likely would not govern the claims against KPMG Mexico.[146] KPMG Mexico is a Mexican entity and the vast majority, if not all, of its relevant conduct appears to have occurred in Mexico. I thus determine that this factor is neutral, or else weighs slightly against dismissing this action under the doctrine of *forum non conveniens*.

### 4. Similar Actions Are, Or Were, Pending In Mexico.

Plaintiffs' federal lawsuit against Citigroup based on the underlying OSA fraud was dismissed under the doctrine of *forum non conveniens* and in favor of a Mexican jurisdiction and, according to Plaintiffs, is on appeal.[147] Certain Plaintiffs or their affiliates have, or had, pending civil actions in Mexico against Banamex, Citibank entities, and OSA.[148] Plaintiffs acknowledge the risk of a double recovery and assert that Defendants can address that through a setoff in the future.[149] But

---

[146] Plaintiffs' expert witness in Mexican law, discussed further in Section D.3. below, opines that "a Mexican court would apply Mexican law to KPMG Mexico." *See* Opposition Br., Expert Declaration of Francisco Gonzalez de Cossio ¶¶ 25-26 (stating that "Mexican courts will apply Mexican law to resolve a case when (1) it involves individuals or entities located in Mexico (such as KPMG Mexico); (2) the conduct or events at issue took place in Mexico (such as the KPMG Mexico stand-alone audits of [OSA and Banamex]); and/or (3) the conduct or events at issue had an effect in Mexico").

[147] *See Florida Dismissal Order*, 2018 WL 3008740; D.I. 68.

[148] *See* Opposition Br. 75 (describing two actions in Mexico by Plaintiffs or their affiliates related to the OSA fraud).

[149] *See id.* at 76 n.170.

under the sixth *Cryo-Maid* factor, the amount of Mexican litigation springing from the same underlying allegations of fraud favors dismissal.

As a result of this and balancing the other *Cryo-Maid* factors, and under these unusual facts, I rule that KPMG Mexico has made the stringent[150] showing of overwhelming hardship necessary to dismiss claims against it based on *forum non conveniens*.

**D.      There Is No Actual Conflict Of Laws On Dispositive Merits Claims, Which Require Dismissal.**

Having decided that KPMG US is the only party over which the Court has personal jurisdiction, I now evaluate the claims against it under Rules 9(b) and 12(b)(6). To begin, the parties dispute whether Delaware, Mexico, or New York law applies to Plaintiffs' claims. KPMG US claims that either Mexico or New York law applies, but not Delaware. It also argues that any of the three requires dismissal. Plaintiffs counter that the only choices are between Mexico and Delaware, but that there is no conflict and, if there were, Delaware law would apply to preserve their claims.

"Delaware courts use a two-part test to determine which sovereign's law to apply when there is a conflict: first, the court determines whether there is an actual

---

[150] *Martinez II*, 86 A.3d at 1106 ("[A]lthough the overwhelming hardship standard is stringent, it is not preclusive.").

41

conflict of law between the proposed jurisdictions."[151]  Where the ultimate result would be the same under either proposed jurisdiction, there is no actual conflict.[152] "In cases where there is a 'false conflict'—meaning there is no material difference between the laws of competing jurisdictions—the court 'should avoid the choice of law analysis altogether.'"[153]  "If there is a conflict, the court determines which jurisdiction has the 'most significant relationship to the occurrence and the parties' based on the factors (termed 'contacts') listed in the Restatement (Second) of Conflict of Laws."[154]  "In cases where foreign law may be applicable, 'the party seeking the application of foreign law,'" in this case KPMG US, has "the burden of adequately proving the substance of the foreign law.'"[155]

I first examine whether the proposed jurisdictions conflict in their application to Plaintiffs' claims against KPMG US.  If the proposed jurisdictions would render

---

[151] *Bell Helicopter Textron, Inc. v. Arteaga*, 113 A.3d 1045, 1050 (Del. 2015).

[152] *See, e.g., Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010); *CertiSign Holding, Inc. v. Kulikovsky*, 2018 WL 2938311, at *22-23 (Del. Ch. June 7, 2018); *In re Bay Hills Emerging Partners I, L.P.*, 2018 WL 3217650, at *4-5 (Del. Ch. July 2, 2018), *appeal refused sub nom. BHEP GP I, LLC v. Kentucky Ret. Sys.*, 191 A.3d 292 (Del. 2018); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 773 (Del. Ch. 2014).

[153] *In re Bay Hills Emerging Partners I, L.P.*, 2018 WL 3217650, at *4-5 (quoting *Deuley*, 8 A.3d at 1161).

[154] *Bell Helicopter*, 113 A.3d at 1050.

[155] *Vichi*, 85 A.3d at 765 (quoting *Republic of Panama v. Am. Tobacco Co.*, 2006 WL 1933740, at *4 (Del. Super. Ct. June 23, 2006), *aff'd sub nom. State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116 (Del. 2007)).

the same result on a particular claim, differences in the path getting there present only "false conflicts" that, for choice of law purposes, are not conflicts at all.[156] For instance, if Plaintiffs' claim would fail at least one necessary element in each proposed jurisdiction, there is no conflict of law because all jurisdictions would compel dismissal.[157] I therefore review the merits of the claims under each jurisdiction, at least up to the point where I encounter a merits-dispositive conflict that requires me to proceed with the choice of law analysis.

I conclude that all of Plaintiffs' claims fail, regardless of which law is applied.[158] Accordingly, there is no actual conflict of laws and Plaintiffs' claims are dismissed pursuant to Delaware law.

---

[156] *See CertiSign Holding, Inc.*, 2018 WL 2938311, at *22-23 (finding no conflict because "[w]hile the pathways may vary some, the application of either Brazilian or Delaware law leads to the same final destination").

[157] In the interests of judicial restraint and the number of alternative grounds for relief examined in this opinion, I need not reach further to review any additional claims under that scenario.

[158] Delaware's pleading standards apply as procedural law of the forum. *See Kramer v. Am. Pac. Corp.*, 1998 WL 442766, at *3 (Del. Super. Ct. July 28, 1998) ("Use of forum pleading rules 'tends to be efficient, as the forum law is to some extent already known and applying it thus involves little learning costs.'" (quoting *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, 1994 WL 728816, at *4 (Del. Ch. Dec. 16, 1994))); *see also Stone & Webster Eng'g Corp. v. Brunswick Pulp & Paper Co.*, 209 A.2d 890, 891 (Del. Super. Ct. 1965) (applying Rule 9(b) to Georgia law claim).

### 1. Plaintiffs Fail To Plead Negligent Misrepresentation Under Delaware Law.

Plaintiffs' three claims are for negligent misrepresentation. Delaware law requires that Plaintiffs "must adequately plead that (1) the defendant had a pecuniary duty to provide accurate information, (2) the defendant supplied false information, (3) the defendant failed to exercise reasonable care in obtaining or communicating the information, and (4) the plaintiff[s] suffered a pecuniary loss caused by justifiable reliance upon the false information."[159]

#### a. Plaintiffs Fail To Sufficiently Plead A Duty Owed By KPMG US.

The first element requires that Plaintiffs plead a duty by KPMG US to the creditors and bondholders of OSA. Plaintiffs are not creditors or clients of KPMG US. The parties agree that Section 552 of the Restatement (Second) of Torts guides this issue.[160] That section, titled "Information Negligently Supplied for the Guidance of Others," reads:

---

[159] *Steinman v. Levine*, 2002 WL 31761252, at *15 (Del. Ch. Nov. 27, 2002), *aff'd,* 822 A.2d 397 (Del. 2003).

[160] KPMG US Opening Br. 25 n.29; KPMG Mexico Opening Br. 15 n.2; Opposition Br. 28; *see generally Lundeen v. PricewaterhouseCoopers, LLC*, 2006 WL 2559855, at *6 (Del. Super. Ct. Aug. 31, 2006); *Coleman v. PricewaterhouseCoopers LLC*, 2005 WL 1952844, at *3 (Del. Super. Ct. July 29, 2005) ("*Coleman I*"), *aff'd*, 902 A.2d 1102 (Del. 2006); *Carello*, 2002 WL 1454111, at *4.

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

    (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

    (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.[161]

"[A] plaintiff invoking a cause of action under negligent misrepresentation involving section 552 must show that the defendant supplied the information to a party for use in that party's business transactions with the plaintiff or a class of which the plaintiff was a member."[162]

The heart of the parties' dispute on this issue is whether comment h, illustration 10 of Section 552 applies. Comment h is titled "Persons for whose

---

[161] Restatement (Second) of Torts § 552 (Am. Law Inst. 1977).

[162] *Carello*, 2002 WL 1454111, at *5.

45

guidance the information is supplied," and specifically discusses the narrowed scope

of liability for a supplier of information as compared to whoever made the

underlying fraudulent representation found within the supplied information. In line

with Section 552(2)(a)'s focused audience of a "limited group," comment h explains,

"[i]t is enough that the maker of the representation intends it to reach and influence

either a particular person or persons, known to him, or a group or class of persons,

distinct from the much larger class who might reasonably be expected sooner or later

to have access to the information and foreseeably to take some action in reliance

upon it."[163] Illustration 10 addresses facts much like those here:

> A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is not liable to X Bank.[164]

---

[163] Restatement (Second) of Torts § 552 cmt. h.

[164] *Id.* cmt. h illus. 10.

*Carello v. PricewaterhouseCoopers LLP* is the seminal Delaware decision addressing illustration 10. The Superior Court denied an auditor's motion for summary judgment and permitted negligent misrepresentation claims to go forward. The plaintiffs in *Carello* were the sole stockholders of a company that they sold subject to an earn-out formula.[165] The buyer acquired seventy-six companies over a three-year period and had its financial statements audited by the defendant auditor. Soon after the acquisition, the buyer filed for bankruptcy and could not meet its earn-out obligations to the sellers.[166] The sellers sued the auditor, alleging that it misrepresented the buyer's financial health and specifically advised the sellers that the acquisition was a good deal.[167] In denying the auditor's motion for summary judgment, the *Carello* court distinguished illustration 10 because "[i]n the illustration, the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender."[168] In contrast, the record in *Carello* suggested that the auditor may have prepared its audits to influence the acquisition of plaintiffs' company.[169]

---

[165] *Carello*, 2002 WL 1454111, at *1.

[166] *Id.* at *2.

[167] *Id.* at *2.

[168] *Id.* at *7.

[169] *Id.* at *7.

Defendants argue that illustration 10 compels dismissal here because it shows that even where an auditor knows that its client's creditors, lenders, and investors may rely on an audit and related materials, "knowledge of such uses is not sufficient to create the requisite duty,"[170] and that, under *Carello*, the illustration forecloses liability where the audited materials were "only collaterally or incidentally audited to benefit a potential lender."[171] Plaintiffs counter that *Carello* interpreted illustration 10 to apply only "where the auditor neither knows nor has reason to know of the intended use of which the audited statements will be put,"[172] whereas Plaintiffs have alleged that Defendants "had reason to know that Plaintiffs (or similarly situated persons) would rely on KPMG's audits in connection with their business dealings with OSA."[173]

In accord with *Carello*, I believe illustration 10 highlights that liability for third-party negligent misrepresentation requires satisfaction of both Sections 522(2)(a) and (b). An auditor must intend to supply the relevant information, or know that the recipient intends to supply it, for the benefit and guidance of a limited group. But the knowledge that a group may rely on the audits is not enough to

---

[170] KPMG US Reply Br. 10-11; *see also* KPMG Mexico Reply Br. 15 n.23.

[171] *Carello*, 2002 WL 1454111, at *7.

[172] *Id.* at *7.

[173] Opposition Br. 28 n.52.

establish liability.[174]  The auditor must also know, or have reason to know, how that

group intends to use the information.[175]  Essentially, Section 552 limits liability of

information suppliers when that information gets into the hands of the public to

situations when the information supplier has or should have (a) knowledge of a

limited, but perhaps unnamed, group, as well as (b) knowledge of the actual financial

---

[174] *Carello*, 2002 WL 1454111, at *7 ("Thus, under the Restatement, an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client."). The parties also dispute the interpretation of two cases from North Carolina's Supreme Court addressing illustration 10, both of which generally hold that "[w]hether the auditor acquires this knowledge from his client or elsewhere should make no difference," because "[i]f he knows at the time he prepares his report that specific persons, or a limited group of persons, will rely on his work, and intends or knows that his client intends such reliance, his duty of care should extend to them." *Raritan River Steel Co. v. Cherry, Bekaert & Holland*, 367 S.E.2d 609, 618 (N.C. 1988); *see also Marcus Bros. Textiles v. Price Waterhouse, LLP*, 513 S.E.2d 320, 326-27 (N.C. 1999) (same). Those cases crystallize that an auditor can acquire knowledge from sources other than its client, and do not impact my analysis here.

[175] *Carello*, 2002 WL 1454111, at *6-7 (finding that illustration 10 "applies only to audited statements where the auditor neither knows nor has reason to know of the intended use to which the audited statements will be put"); *see also Coleman I*, 2005 WL 1952844, at *1 n.1 ("[F]or an accounting firm to be held liable to plaintiffs who had no direct contractual relation to the accounting firm, 'at the time [the accounting firm] was auditing [its client's] financial statements, [the accounting firm] would have had to have known (or have had reason to have known) that [its client] would share those statements with [a] class [of similarly-situated business owners who had sold their businesses to the client] or with [those] [p]laintiffs as part of a potential business transaction.'" (quoting *Carello*, 2002 WL 1454111, at *4)). In my view, illustration 10 also demonstrates that duties are established as of the time of an audit, and do not generally extend to those who may only come to rely on the audit after it is issued. *See Carello*, 2002 WL 1454111, at *5 (noting that comment h of Section 552 supports an interpretation that measures the information supplier's knowledge at the moment the audit report is published).

transactions that the information is designed to influence.[176] Applying those two requirements to the allegations against KPMG US, I find that Plaintiffs have failed to plead a reasonably conceivable scenario in which KPMG US owed a duty to OSA's creditors and bondholders under Delaware law.

Under Section 552(2)(a), Plaintiffs are not among the limited groups for whose benefit and guidance KPMG US intended to supply information. Plaintiffs are creditors of OSA and have no direct relationship with KPMG US. KPMG Mexico audited OSA, but KPMG US only audited Citigroup, which in turn only did business with OSA through Banamex, its Mexican subsidiary. KPMG US may have generally known that the stockholders and creditors of Citigroup, or potentially Banamex, might rely on its audits.[177] But OSA was not affiliated with Citigroup or Banamex. It had only a "collateral[] or incidental[]"[178] business relationship with Citigroup and Banamex, at least to the external observer.[179] Creditors of a third-

---

[176] *Id.* at *6-7.

[177] *See* Restatement (Second) of Torts § 552 cmt. h illus. 10. I do not intend to rule here that stockholders and creditors of an auditor's client are always a "limited group" under Section 552(2)(a).

[178] *Carello*, 2002 WL 1454111, at *7 (in discussing Section 552, finding that "[i]n the illustration [10 to comment h], the financial statements were audited by an accountant primarily to benefit its own client and only collaterally or incidentally audited to benefit a potential lender").

[179] Plaintiffs allege that OSA and Citigroup conspired in fraud, but do not allege that KPMG or the public knew about it.

party entity that did business with a subsidiary of KPMG US's client are not within the "limited group" contemplated by Section 552(2)(a) for KPMG US's audits of that client.

Creditors with distant relationships to an auditor, like Plaintiffs to KPMG US, may be able to allege that the auditor intended to supply information to that creditor or knew the auditor's client would do so.[180] But Plaintiffs have not done so here. Plaintiffs rely on specific paragraphs of their Complaint to attempt to satisfy Section 552(2)(a).[181] These paragraphs offer conclusory allegations of Defendants' knowledge that Plaintiffs would reasonably rely on the Audits. Even under the lenient standards of Rule 12(b)(6), Plaintiffs have failed to allege that they were among the limited groups for whose benefit and guidance KPMG US (i) intended to supply the Citigroup and Banamex Component Audits or (ii) knew that the recipient companies intended to supply them.[182]

---

[180] *See id.* at *5-7.

[181] *See* Compl. ¶¶ 5, 13, 17-18, 43, 47, 106, 185, 266, 303, 389, 473, 494, 513.

[182] *See Brug v. Enstar Grp., Inc.*, 755 F. Supp. 1247, 1258 (D. Del. 1991) (finding that stockholders could not bring negligent misrepresentation claim against defendants where misrepresentations were in public documents because "[i]f any member of the public who might choose to invest in [the company's] common stock were to qualify as part of a protected class, then [Section 552's] 'limited group' requirement would be meaningless); Restatement (Second) of Torts § 552(2)(a).

Plaintiffs also fail to allege that they relied on the audits at issue in a transaction that KPMG US or its clients intended to influence, per Section 552(2)(b). While "[t]he liability of the maker of the *fraudulent* representation extends to all transactions of the type or kind that the maker intends or has reason to expect," under Section 552(2)(b), "the liability of the maker of a *negligent* misrepresentation is limited to the transaction that he intends, or knows that the recipient intends, to influence, or to a substantially similar transaction."[183] "[U]nder the Restatement, an information supplier retained to furnish information for no particular purpose does not undertake a duty to third parties when the information supplier neither knows nor has reason to know of the intended use to which that information will be put by the information supplier's client."[184] Plaintiffs have not adequately pled that KPMG US had any knowledge, constructive or otherwise, of the particular and disparate transactions for which Plaintiffs might rely on the Audits, much less any transaction that KPMG US "intend[ed] the information to influence or kn[ew] that the recipient

---

[183] Restatement (Second) of Torts § 552 cmt. j (emphasis added); *see also id.* at cmt. j illus. 14 ("A, an independent public accountant, negligently conducts an audit for B Corporation, and issues an unqualified favorable opinion on its financial statements, although it is in fact insolvent. A knows that B Corporation intends to exhibit the balance sheet to C Corporation, as a basis for applying for credit for the purchase of goods. In reliance upon the balance sheet, C Corporation buys the controlling interest in the stock of B Corporation and as a result suffers pecuniary loss. A is not liable to C Corporation.").

[184] *Carello*, 2002 WL 1454111, at *6.

so intends, or [] a substantially similar transaction."[185]  Nor have Plaintiffs alleged that Defendants reached out to them to influence their actions with respect to OSA, as in *Carello*.  Section 552(2)(b) precludes liability because KPMG US cannot hold a duty to Plaintiffs where it "neither [knew] nor ha[d] reason to know of the intended use to which that information [would] be put by" OSA's creditors.[186]

Plaintiffs seek to hold KPMG US vicariously liable for KPMG Mexico's audit of OSA under a joint venture or agency theory.  I do not evaluate such an imputation because Plaintiffs have also failed to allege KPMG Mexico owed any duty to OSA's creditors and bondholders.[187]  Plaintiffs have not alleged that even KPMG Mexico knew of, or intended to influence, the myriad transactions in which Plaintiffs engaged with OSA under Section 552(2)(b).[188]  And, as I explain below, Plaintiffs have failed to plead justifiable reliance as to any of the Audits.

---

[185] Restatement (Second) of Torts § 552(2)(b).

[186] *Carello*, 2002 WL 1454111, at *6.

[187] Plaintiffs' allegations of duty are strongest in their claims based on the OSA Audits because of KPMG Mexico's relative proximity to Plaintiffs.  *See* Restatement (Second) of Torts § 552 cmt. h illus. 10 (noting that auditors may know "that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions").  I do not foreclose Plaintiffs from being within the "limited group" contemplated by Section 552(2)(a) with respect to KPMG Mexico.

[188] *See* Compl. ¶¶ 5, 473-74, 494-95, 513-514 (alleging generally that Plaintiffs relied on negligent misrepresentations when they when they "(i) purchased the bonds of, (ii) loaned

### b. Plaintiffs Fail to Plead Their Reliance On Any Misrepresentation.

Had Plaintiffs adequately pled a duty from KPMG US, their claims would still fail because they have not adequately pled justifiable reliance on Defendants' work. "A negligent misrepresentation claim must be stated with the same [particularity] required for fraud."[189] "Under Rule 9(b), the circumstances that must be stated with particularity are the time, place, and contents of the false representation, the identity of the person(s) making the representation, and what he intended to obtain thereby."[190] "The entire purpose of Rule 9(b) is to put the defendant on notice so that he can adequately prepare a defense."[191] To adequately plead a claim for misrepresentation, a plaintiff must allege that the defendant's false representation caused the plaintiff, in justifiable reliance on the representation, to act or refrain from acting.[192] "'Justifiable reliance requires that the representation relied

---

money to, (iii) sold or leased vessels or goods to, or (iv) otherwise extended credit to [OSA].").

[189] *PR Acquisitions, LLC*, 2018 WL 2041521, at *13.

[190] *H-M Wexford LLC*, 832 A.2d at 145; *see also Abry Partners*, 891 A.2d at 1050.

[191] *Browne v. Robb*, 583 A.2d 949, 955 (Del. 1990); *see also C.V. One v. Res. Grp.*, 1982 WL 172863, at *2 (Del. Super. Ct. Dec. 14, 1982) ("Rule 9(b) has three purposes: (1) Allegations must be specific enough to inform defendants of the act plaintiff complains of and to enable defendant to prepare an effective response and defense; (2) Eliminate complaints filed as a pretext for discovery of unknown wrongs; and (3) To protect defendant from unfounded charges of wrongdoing which could injure his reputation and goodwill.").

[192] *Underwriters at Lloyd's*, 2007 WL 2813774, at *4.

upon involve a matter which a reasonable person would consider important in determining his choice of action in the transaction in question,' *i.e.*, that the matter misrepresented is material."[193] How Plaintiffs relied on KPMG US's statements "seems to be the type of information that would be particularly within the control of the plaintiffs."[194] Delaware courts reject allegations of reliance that fail to meet Rule 9(b)'s pleading standards.[195]

Plaintiffs allege that they relied on the "financial statements, audit opinions and other financial investment reports that KPMG created, audited, certified, assisted in preparing and/or knew would be prepared based on work it performed and information it supplied" as part of the Audits for OSA, Citigroup and Banamex.[196] Throughout the Complaint's five hundred and twenty paragraphs,

---

[193] *Vichi*, 85 A.3d at 813-14 (quoting *Lock v. Schreppler*, 426 A.2d 856, 863 (Del. Super. Ct. 1981)).

[194] *See Anglo Am. Sec. Fund, L.P. v. S.R. Global Intern. Fund, L.P.*, 829 A.2d 143, 159 (Del. Ch. 2003).

[195] *See, e.g.*, *Mooney v. Pioneer Nat. Res. Co.*, 2017 WL 4857133, at *8 (Del. Super. Ct. Oct. 24, 2017) ("Plaintiff has not pled with particularity that he justifiably relied on Defendant's alleged misrepresentations because he fails to plead with particularity just how he so relied."); *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2 (Del. Ch. Nov. 30, 2004). (dismissing fraud claims where the complaint alleged only "general reliance"); *Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 159 (holding that justifiable reliance must be pled with particularity under Rule 9(b)); *Smith v. Smitty McGee's, Inc.*, 1998 WL 246681, at *5 (Del. Ch. May 8, 1998) (dismissing fraud claim where "the elements of fraud," including justifiable reliance, "have not been particularly pled").

[196] *See, e.g.*, Compl. ¶¶ 473-74, 494-95, 513-14.

Plaintiffs only allege that they "relied," "reasonably relied," or "received, reviewed and relied upon" the Audits and related financial statements.[197]  Plaintiffs generally allege that they relied on the Audits "when they (i) purchased the bonds of, (ii) loaned money to, (iii) sold or leased vessels or goods to, or (iv) otherwise extended credit to [OSA]."[198]  Such conclusory allegations are insufficient to plead reliance.[199]  Without specifying which financial statements, Audits, or other financial investment reports each Plaintiff relied on  and when each Plaintiff relied on them, KPMG US cannot mount an effective defense to this action, while Plaintiffs are free to seek broad discovery based on their expansive allegations.[200]

---

[197] *See, e.g.*, *id.* ¶¶ 5, 66, 67, 75, 84, 91, 98, 104, 474-76, 495, 514.  As to some Audits, Plaintiffs do not allege even that they received or reviewed them.  *See, e.g.*, *id.* ¶¶ 76, 85, 92, 99.

[198] *See id.* ¶¶ 5, 473-74, 494-95, 513-514.

[199] *Goggin*, 2018 WL 2149718, at *10 (noting conclusory allegations of reliance, without an explanation of what plaintiff did in reliance, are insufficient); *Smitty McGee's, Inc.*, 1998 WL 246681, at *5 ("One obvious defect in plaintiff's allegation is the statement that he 'relied upon' [the] statement. This conclusory statement is insufficient; to plead reliance with particularity, plaintiff must explain what he did, or refrained from doing, in justifiable reliance upon the statement."); *compare H-W Wexford*, 832 A.2d at 146-47 (noting the plaintiff "specifically alleged that it relied non the defendants' ostensibly false representations in the Purchase Agreement in deciding to participate in the February 2001 Offering," and concluding such allegations satisfied the requirements of Rule 9(b)).

[200] Plaintiffs did not attach any of the "financial statements, audit opinions and other financial investment reports" allegedly relied on to the Complaint.  *See* Compl. ¶¶ 473-74, 494-95, 513-14.  In their briefing, Plaintiffs argue "the Complaint alleges that the negligent [Audits] misrepresented (1) the financial health of the company; and (2) that KPMG failed to comply with audit standard when conducting these audits," and cite various paragraphs of the Complaint as support.  Opposition Br. 22-23 (citing paragraphs 3, 16-21, 41, 220,

Plaintiffs again rely on *Carello*, which held that the sellers of an entity had adequately alleged negligent misrepresentation on audited financial statements for the buyer. But *Carello* did not separately analyze the element of justifiable reliance.[201] Even if it had, that case is far from these facts, as the sellers had pled that the buyer's auditor specifically advised the seller plaintiffs that the acquisition was a "good deal," and that the auditor may have slanted the financial statements to be more attractive to those sellers.[202] By contrast, Plaintiffs have not pled that KPMG US was working with OSA to perpetrate or hide the frauds, nor have Plaintiffs pled they relied on specific communications with KPMG US about the Audits. Plaintiffs also have not pled which financial statements, Audits, and other financial investment reports they relied on or when they relied on them. The

---

242-44, 247, 255-57, 277, 282, 298-354 of the Complaint). Those paragraphs fail to tie in to particular audits or related materials.

[201] *See Carello*, 2002 WL 1454111, at *3-7 (noting Plaintiffs' allegations of reliance for factual explanation, discussing reliance only in the application of Section 552, and denying the auditor's motion for summary judgment).

[202] *Id.* at *2, 6. Plaintiffs' other authorities likewise fail to demonstrate their allegations are sufficient. *See Brevet Capital Special Opportunities Fund, LP v. Fourth Third, LLC*, 2011 WL 3452821, at *7 (Del. Super. Ct. Aug. 5, 2011) (finding sufficient allegations of reliance where the complaint specified the nature of the misrepresentation, the assumption that triggered in plaintiff, and the interactions between the parties leading to that reliance); *Stuchen v. Duty Free Int'l, Inc.*, 1996 WL 33167249, at *7 (Del. Super. Ct. Apr. 22, 1996) (finding sufficient allegations of reliance from stockholder plaintiffs based on a financial advisor's fairness opinion for a merger); *Snyder v. Butcher & Co.*, 1992 WL 240344, at *1 (Del. Super. Ct. Sept. 15, 1992) (denying motion to dismiss fraud claim where investor plaintiffs alleged reliance on the projections and strategies in a private placement memorandum).

conclusory allegations that Plaintiffs relied on Defendants' work product to their detriment are "glaringly insufficient."[203]

Plaintiffs' conclusory allegations of reliance are particularly troubling because some of the Audits are divorced from the main period of fraud. Plaintiffs most heavily detail an alleged fraudulent scheme between August or September 2013 and February 2014.[204] In February 2014, the SFP and Citigroup published their conclusions on the cash advance facility. However, Defendants issued the only Audit opinions covering the August 2013 to February 2014 period *after* the alleged fraud was brought to light, including by Citigroup itself.[205] Those Audits, of course, could not undergird justifiable reliance on misrepresentations about the already-exposed fraud.[206] Plaintiffs instead advance their allegations that the fraud may have

---

[203] *Anglo Am. Sec. Fund, L.P.*, 829 A.2d at 159; *see also Goggin*, 2018 WL 2149718, at *10.

[204] *See* Compl. ¶¶ 260, 263.

[205] *See* KPMG US Opening Br., Affidavit of Robert A. Scher ¶ 5 & Ex. 4 (stating that "KPMG US issued an audit opinion for Citigroup on March 3, 2014 for fiscal year 2013" and attaching a true and accurate copy); KPMG Mexico Opening Br., Declaration of Jorge E. Moreno Palacio ¶ 14 & Ex. 12 (attaching a "true and correct copy of the record of Banamex's March 3, 2014 filing of the 2013 audited financial statements"). The Audits are incorporated by reference into the Complaint. *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 797 (Del. Ch. 2016) ("[T]he incorporation-by-reference doctrine . . . permits a court to consider documents that have been incorporated by reference in a complaint when ruling on a motion to dismiss.").

[206] *See Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) ("'To establish justifiable reliance, [a plaintiff] must demonstrate he did not have either the awareness or opportunity to discover the accurate information.'"

begun "as early as 2010,"[207] and that the Audits failed to identify internal controls that could have prevented the fraud.[208]  But Plaintiffs fail to explain how they detrimentally relied on any Audits or related materials issued during a period in which they only speculate that fraud may have been occurring.

In addition, several Plaintiffs purchased their securities or otherwise entered into transactions with OSA either before the Audits were issued[209] or after OSA's fraud was exposed.[210]  Those Plaintiffs who became creditors before the Audits, such as the bondholders from OSA's 2008 offering, could not have relied on the Audits or related materials for their initial decisions.[211]  The same holds true for those who purchased securities following the public exposure of OSA's fraud, at least with respect to alleged reliance on misrepresentations about that fraud.  I need not reach which of the Plaintiffs fall into those categories at this stage, and note only that several Plaintiffs would face additional hurdles to pleading reliance.

---

(quoting *Tekstrom, Inc. v. Savla*, 2006 WL 2338050, at *11 (Del. Super. Ct. July 31, 2006), *aff'd,* 918 A.2d 1171 (Del. 2007))).

[207] *See* Compl. ¶¶ 258, 261, 486, 505, 519.

[208] *See, e.g.*, *id.* ¶¶ 12, 255, 282, 332-38; Opposition Br. 24-25.

[209] *See, e.g.*, *id.* ¶¶ 109-165.

[210] *See, e.g.*, *id.* ¶¶ 170, 173.

[211] *See Goggin*, 2018 WL 2149718, at *10 ("[G]iven that [plaintiff] had already invested . . . before the fraud began, it is hard to see how it could successfully plead reliance.").  The parties contest whether Plaintiffs are asserting holder claims and, if so, whether Delaware law recognizes those claims.  Even assuming, without deciding, that such claims are valid, those Plaintiffs have failed to sufficiently plead reliance.

For all of these reasons, Plaintiffs fail to state a claim for negligent misrepresentation, whether under Rule 9(b) or under the more lenient standard of Rule 12(b)(6).

### 2. Plaintiffs Fail To Sufficiently Plead A Claim Under New York Law.

New York has adopted its own standard for the liability of accountants and auditors to third-parties. "It has long been the law in New York that a plaintiff in an action for negligent misrepresentation must show either privity of contract between the plaintiff and the defendant or a relationship 'so close as to approach that of privity.'"[212] New York's highest court ruled in *Credit Alliance Corp. v. Arthur Andersen & Co.*:

> Before accountants may be held liable in negligence to noncontractual parties who rely to their detriment on inaccurate financial reports, certain prerequisites must be satisfied: (1) the accountants must have been aware that the financial reports were to be used for a particular purpose or purposes; (2) in the furtherance of which a known party or parties was intended to rely; and (3) there must have been some conduct on the part of the accountants linking them to that party or parties, which evinces the accountants' understanding of that party or parties' reliance.[213]

New York's test is designed to limit liability in cases like this one. In one of the bedrock precedents leading up to *Credit Alliance*, Justice Cardozo expressed

---

[212] *Sykes v. RFD Third Ave. 1 Assocs., LLC*, 938 N.E.2d 325, 326 (N.Y. 2010) (quoting *Ultramares Corp. v. Touche*, 174 N.E. 441, 446 (N.Y. 1931)).

[213] *Credit All. Corp. v. Arthur Andersen & Co.*, 483 N.E.2d 110, 118 (N.Y. 1985), *amended,* 489 N.E.2d 249 (N.Y. 1985)

60

doubt over expansive liability for accountants, stating that "[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class."[214] Because New York's standard is more chary of Plaintiffs' claims than Delaware's, I find it sufficient to hold that the result under New York law does not conflict with the result under Delaware law, and so any conflicts between the standards are false conflicts.[215]

### 3. Plaintiffs Fail To Sufficiently Plead A Claim Under Mexican Law.

To assist in my review of Mexican law, the parties have each provided expert witnesses.[216] Defendants' principal expert is Carlos Loperena ("Loperena," who

---

[214] *Ultramares Corp.*, 174 N.E. at 444.

[215] Plaintiffs argue that only Mexican or Delaware law could apply because Defendants assert New York law as an alternative to Mexican law. Opposition Br. 84. I find this argument unpersuasive and have considered all three jurisdictions. Plaintiffs only address *Credit Alliance* by footnote and assert that Defendants formed a "single, unified global enterprise" and "necessarily understood that the 'end and aim' of their work would be Plaintiffs' reliance when contemplating engaging in or continuing to do business with OSA." *Id.* at 32 n.58. This argument finds no support in a sympathetic reading of the Complaint, and I do not address it further.

[216] Ct. Ch. R. 44.1 ("The Court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43. The Court's determination shall be treated as a ruling on a question of law.").

submitted the "Loperena Declaration"),[217] and Plaintiffs' is Francisco Gonzalez de Cossio ("Gonzalez," who submitted the "Gonzalez Declaration").[218]  Both experts are well-established Mexican lawyers and have provided thoughtful analyses of the relevant legal principles.  Unsurprisingly, they disagree on the interpretation and application of virtually every issue.  I rely on the experts' interpretations of Mexican law, but also turn to relevant authorities to address some of the experts' stalemates on interpretative questions.

Mexico operates on a civil law system, as distinguished from Delaware's or New York's common law systems, and its legal system is generally codified into various rules and statutes, the interpretation of which relies only on a narrow subset of case law.[219]  Principal to this dispute is Mexico's Federal Civil Code (the

---

[217] Superior Court Action, D.I. 26.

[218] Superior Court Action, D.I. 99.

[219] *See Bell Helicopter*, 113 A.3d at 1057 n.54 ("Mexican law relies on a civil code rather than judge-made common law[.]"); Loperena Decl. ¶ 10; Gonzalez Decl. ¶¶ 11-13.  This makes the experts' declarations somewhat less useful given the relatively low value of precedent in Mexico's legal system and the lack of on-point authority for most material, contested issues. *See also Martinez v. E.I. DuPont De Nemours & Co.*, 82 A.3d 1, 33 (Del. Super. Ct. 2012) ("While Delaware courts are frequently called upon to interpret and apply foreign laws, when those laws are in Spanish and have been enacted in the context of a civil law system originating from the Napoleonic Code, the application of foreign law imposes that much more of a hardship."), *aff'd*, 86 A.3d 1102 (Del. 2014).

"MFCC").[220]  Mexico's standard for Plaintiffs' claims makes for an awkward fit into Delaware's choice of law analysis.  Both experts agree that Mexico does not have a defined set of individual torts with required elements, at least as applicable to this case.[221]  Instead, all torts—referred to by the experts as "off-contract" or "extra-contractual" liability[222]—are enshrined in MFCC Article 1910, which provides a broad, generalized standard for liability: "[h]e who acting illicitly or against good customs causes damage to another, is obliged to repair it, unless he proves that the damage occurred as a consequence of fault or inexcusable negligence of the victim."[223]  Illicit behavior, in turn, is defined by Article 1830: "[a]n act is illicit which is contrary to the laws of public policy or to good customs."[224]

The experts clash on whether Article 1910 contemplates claims for negligent misrepresentation by auditors to third parties.  Loperena asserts that extra-

---

[220] The experts lightly dispute whether to apply the Federal or Mexico City codes, but agree that they are relevant in all material respects.  *See* Loperena Decl. ¶ 10 n.2; Gonzalez Decl. ¶ 13 n.4.

[221] *See* Loperena Decl. ¶¶ 10, 13, 20; Gonzalez Decl. ¶¶ 11-13, 72.

[222] *See* Gonzalez Decl. ¶ 76.  I will also refer to the torts as extra-contractual liability.

[223] *Id.* ¶ 78.  The statutes themselves, and all or virtually all authority regarding them, are in Spanish.  I use the experts' translations in this opinion, and note the differences where they may be useful.  In this instance, Loperena's version reads: "Whoever, by acting illicitly or against the good customs and habits, causes damages to another shall be obligated to compensate him, unless he can prove that the damage was caused as a result of the fault of inexcusable negligence of the victim."  Loperena Decl. ¶ 20.  For my analysis, the two are equivalent.

[224] *Id.* ¶ 21.

63

contractual liability categorically "does not allow for negligent misrepresentation claims by third parties against auditors" because "[i]n the course of performing client services, a professional services entity has a duty, and potential liability, to its clients and no one else."[225] Loperena claims that "[o]nly a contractual duty can give rise to a claim against a professional services entity in connection with its work," and points to MFCC Article 2615, which reads that "[h]e who renders professional services, only is liable, toward the persons whom he/she services for negligence, unskillfulness or fraud, without prejudice to the penalties he/she may incur in case of crime."[226] Loperena asserts that Article 2615 excludes all extra-contractual liability for auditors, although he provides no authority in support of that reading.

In contrast, Gonzalez opines that "Mexican law does *not* preclude negligent misrepresentation claims against auditors by third parties."[227] He states that "Mexico clearly recognizes negligent tort claims," and cites a handful of authorities that appear to support that conclusion.[228] Gonzalez argues that Article 1910 embodies a general duty not to harm others, and that "should a harm exist, *whomever* caused it

---

[225] *Id.* ¶¶ 17, 25-26.

[226] *Id.* ¶¶ 18-19, 27.

[227] Gonzalez Decl. ¶ 72 (emphasis in original).

[228] *Id.* ¶ 78 n.35.

64

will be legally bound to remedy it, should other conditions be met."[229] With respect to Article 2615, Gonzalez claims that Loperena's translation misses a key comma[230] that clarifies the statute's purpose is to limit liability for contractual claims, rather than to preclude extra-contractual claims.[231]

In my view, both experts overstate their position to some degree. Loperena claims that contractual privity with KPMG US's clients displaces any extra-contractual liability to Plaintiffs in this case,[232] but that appears belied by his admission that KPMG US could face extra-contractual liability under Article 1910 for intentional misrepresentations.[233] His narrower claim that Mexican law would not recognize negligent misrepresentation is also offered without support. Gonzalez asserts that the duty to remedy harm is all-encompassing and "upon the existence of

---

[229] *Id.* ¶ 77 (emphasis in original).

[230] The comma Gonzalez adds tracks the original Spanish text of MFCC Article 2615, as provided by the experts. *See id.* ¶¶ 90-92, Loperena Decl. ¶ 18.

[231] *See* Gonzalez Decl. ¶¶ 87-92. Gonzalez concludes that "[i]n other words, article 2615 merely defines what kinds of claims a client can assert against its services provider—it speaks not at all to the kinds of claims a third party may assert." *Id.* ¶ 92.

[232] *See* Loperena Decl. ¶¶ 25 ("A professional services entity is never liable to non-clients for statements made in the context of a client engagement."), 27 ("Only a contractual duty can give rise to a claim against a professional services entity in connection with its work."), 28 ("Liability of audit firms for their audit opinions is limited to the clients who retain them. Non-clients are not owed any duty[.]").

[233] *See id.* ¶ 23. If there is some principled distinction between intentional and negligent extra-contractual liability that explains the puzzle, Loperena did not include it in his opinion.

harm, Mexican law establishes a legal and obligatory relationship between those provoking harm and those suffering it" and binds "whomever caused it . . . to remedy it."[234]  Article 1910 is broad, but does circumscribe liability to those who act "illicitly or against good customs," not merely anyone who causes a harm.[235]

Defendants bear the burden of establishing substantive Mexican law.[236] Plaintiffs' argument that Article 1910's broad standard leaves room for third-party auditor liability is enough to preclude dismissal on Defendants' asserted basis that Mexican law does not recognize the claim of negligent misrepresentation by auditors to third parties.

But Plaintiffs falter on causation. Both experts agree that MFCC Article 2110 governs causation for extra-contractual damages: "[d]amages and losses must be a direct and immediate consequence of failure to comply with the obligation, whether they have already occurred or will necessarily occur."[237] Loperena interprets Article 2110 to provide that if "the damages were caused by other events, *i.e.*, not solely by the alleged misrepresentations, then the misrepresentations were not the immediate

---

[234] Gonzalez Decl. ¶ 77.

[235] *Id.* ¶ 78.  Gonzalez recognizes this in other sections of his opinion.  For instance, he states that "[i]n order to bring an extracontractual claim in Mexico, Plaintiff must allege an (1) unlawful act that (2) caused (3) harm."  *Id.* ¶ 84.

[236] *Vichi*, 85 A.3d at 765.

[237] Loperena Decl. ¶ 33; Gonzalez Decl. ¶ 86.

and direct cause of the damages, and the party who made them bears no liability."[238]

He explains that even "if an audit firm fails to detect a fraud, only the party that committed the fraud is liable, because the damages are a 'direct and immediate consequence' of the fraud, not of the failure to detect it."[239]

Gonzalez opines that the definition of "direct and immediate" is the "subject of case law galore," but that one "of the salient views" is that it means an "effective cause," which Mexican law interprets "by and large as a 'but for' analysis."[240] He also claims that "[s]alient doctrine has interpreted the 'direct and immediate' requirement in the sense that causes closest to the injury are the most relevant ones, in comparison to all the other causes that could also coexist in a tort."[241] Under Gonzalez's view, this means that "if a Plaintiff relied on a professional auditor's work product that included misrepresentations or omissions about the auditor's client, and he or she suffered harm as a result, causation exists under Mexican law."[242]

---

[238] Loperena Decl. ¶ 34.

[239] *Id.* ¶ 35.

[240] Gonzalez Decl. ¶ 86. Gonzalez defines this analysis as: "had the (unlawful) act not occurred, the harm would not have flowed therefrom." *Id.*

[241] *Id.*

[242] *Id.*

In my view, Gonzalez's proffered "but for" standard does not flow naturally from Article 2110's far more restrictive language of "direct and immediate" causation. The authorities Gonzalez provides do not appear to support his view. None of his translated authorities, for instance, use the terms "effective cause" or "but for." And the authority he cites to support "the salient view[]" that Article 2110 requires a "but for" standard[243] states that Mexican courts, when determining whether to attribute a vehicular harm to the driver, a third party, or a victim, must:

> [S]eek the [cause] that is adequate, efficient or decisive, according to the theory of adequate causality, which is based not on the necessary consequence, but on the likely consequence, the statistically probable result of a certain causal antecedent, or that it is, by itself, sufficient to produce that result; as well as to the criterion of objective imputation which, according to the rule of the degree of proximity of the cause of the damage, has to do with reasonable predictability and causally relevant factors.[244]

This does not describe "but for" liability.[245] Instead, it appears to fold in concepts of foreseeability and substantial factor analyses. Under the test employed by

---

[243] *Id.* ¶ 86 n.44.

[244] *Id.* Ex. B at 59.

[245] *See generally* 65 C.J.S. *Negligence* § 207 (Supp. 2019) ("Cause in fact refers to the cause and effect relationship between a defendant's tortious conduct and the plaintiff's injury or loss with 'causation in fact' proved by establishing the injury would not have occurred 'but for' the defendant's negligence. The 'but for' causation standard presupposes that a defendant's negligence began a chain of events leading to the plaintiff's injury and requires proof that the negligence was a probable cause of the resultant injury. Conversely, a defendant's conduct is not a cause of an event or harm if the event or harm would have occurred regardless of the conduct.").

Gonzalez's authority, Plaintiffs have not alleged, for instance, why any negligent misrepresentation by KPMG US would be "sufficient to produce" Plaintiffs' harm without OSA's underlying fraud.

For additional guidance, I look to other U.S. courts that have dealt with this same question. Those courts have widely held Article 2110's causation standard is stricter than a "but for" standard.[246] One view adopted by certain of those decisions is that "Mexican courts have construed the 'immediate and direct consequence' requirement to mean that, in order to impose liability and assess damages, the relationship between a defendant's conduct and the plaintiff's injuries must be so close that there can be no other additional or intervening conduct by another party to which the legal injury or injuries can be attributed."[247] The Mexican standard adopted by other U.S. courts in their comparative law analyses is closer to that in Loperena's opinion.

---

[246] *See Alpert v. Starwood Hotels*, 2018 WL 5456493, at *7 (D. Conn. Oct. 29, 2018) ("When a third party or a fortuitous event contributes to a plaintiff's injury, Mexican law focuses on the foreseeability of that third party's intervention or that event's occurrence to allocate liability between parties."); *Summers v. Hotels*, 2013 WL 12113444, at *4 (C.D. Cal. Sept. 20, 2013) (finding that, compared to California law, "[t]he application of Mexican law would greatly limit an injured plaintiff's opportunity for relief by requiring the injury to be the 'immediate and direct consequence' of the alleged cause"); *Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 61 (D.D.C. 2007), *aff'd,* 256 F. App'x 359 (D.C. Cir. 2007) (finding that, compared to the District of Columbia's law, the Mexican state of Nuevo Leon's law "requires a heightened showing of damages in negligence actions" because "it requires that alleged damages be 'an immediate and direct consequence of the failure to perform' the defendant's duty").

[247] *Summers*, 2013 WL 12113444, at *4; *see also Alpert*, 2018 WL 5456493, at *7.

KPMG US has shown that the applicable standard of Article 2110 forecloses Plaintiffs' action under Mexican law. It is not reasonably conceivable that the Audits directly and immediately caused Plaintiffs' harm. That harm flows principally from OSA's fraud and its subsequent filing for bankruptcy protections, or potentially from misconduct by Citigroup and Banamex. KPMG US's alleged misrepresentations, even if proven, are far too distant to provide a direct and immediate harm under Article 2110. Mexican law therefore compels that I dismiss Plaintiffs' claims.

Because that result harmonizes with Delaware and New York law, there is no actual conflict and I need not complete the choice of law analysis. Delaware law applies by default and, for the reasons explained above, requires that I dismiss Plaintiffs' claims against KPMG US for failure to adequately plead the duty and reliance elements of negligent misrepresentation.[248]

### E. Plaintiffs' Claims Are Timely As Pled.

Defendants assert that Plaintiffs' claims are time-barred under Mexico's statute of limitations.[249] Plaintiffs, in turn, claim that Delaware's statute of limitations applies and should be tolled until February 28, 2014, the date Citigroup issued a press release disclosing the result of its internal investigation into the cash

---

[248] *See In re Bay Hills Emerging Partners I, L.P.*, 2018 WL 3217650, at *5.

[249] KPMG US Opening Br. 34-35; KPMG Mexico Opening Br. 26-27, 30.

advance facility.[250]  Neither party argues that any other jurisdiction's statute of limitations applies.

In weighing the timeliness of a claim, the Court of Chancery considers both the analogous statutes of limitation at law and the equitable doctrine of laches.[251] "Although both laches and statutes of limitation operate to time-bar suits, the limitations of actions applicable in a court of law are not controlling in equity."[252] But "[w]hen an equitable claim seeks legal relief," as here,[253] "the Court [] will apply the statute of limitations by analogy, with . . . presumptive force given its quasi-legal status, and will bar claims outside the limitations period absent tolling or extraordinary circumstances."[254]

---

[250] Opposition Br. 102-105; *see* Compl. ¶ 283.

[251] *Kraft v. WisdomTree Investments, Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016) ("A finding of laches generally requires the presence of three factors: the claimant's knowledge of the claim, unreasonable delay in bringing the claim, and resulting prejudice to the defendant. A party guilty of laches will be prevented from enforcing a claim in equity. . . . The mixture of equitable and legal matters falling within the jurisdiction of the Court of Chancery complicates its application of time-bar principles that originated in equity and at law.").

[252] *Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009).

[253] Plaintiffs seek legal damages for the equitable claims of negligent misrepresentation.

[254] *Kraft*, 145 A.3d at 983; *see also Frederick Hsu Living Tr. v. ODN Holding Corp.*, 2017 WL 1437308, at *43 (Del. Ch. Apr. 14, 2017) ("Nevertheless, because equity generally follows the law, 'a party's failure to file within the analogous period of limitations will be given great weight in deciding whether the claims are barred by laches.'" (quoting *Whittington v. Dragon Grp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009))), *as corrected* (Del. Ch. Apr. 24, 2017).

"A court considering timeliness as a basis for a motion to dismiss must draw the same plaintiff-friendly inferences required in a 12(b)(6) analysis," although "[a] plaintiff asserting a tolling exception must plead facts supporting the applicability of that exception."[255] However, because motions to dismiss are limited to facts appearing on the face of the pleadings, "affirmative defenses, such as laches, are not ordinarily well-suited for treatment on such a motion."[256] While "there is no rule barring this doctrine as the basis for dismissal under Rule 12(b)(6),"[257] dismissal on an affirmative defense like laches is inappropriate "[u]nless it is clear from the face of the complaint that an affirmative defense exists and that the plaintiff can prove no set of facts to avoid it."[258]

"Even if another state's substantive law may govern the parties' rights in a given case, the 'general rule is that the forum state's statute of limitations

---

[255] *State ex rel. Brady v. Pettinaro Enterprises*, 870 A.2d 513, 524-25 (Del. Ch. 2005); *see also Eni Holdings, LLC v. KBR Grp. Holdings, LLC*, 2013 WL 6186326, at *11 (Del. Ch. Nov. 27, 2013) ("The reason for this requirement is plain: having discovered the facts sufficient to bring an action, a counterclaimant is uniquely aware of the circumstances which caused it to fail to do so in a timely manner; consequently, it bears the burden of pleading with specificity the reasons that the defendant should not enjoy the protections of the statutorily-imposed (or bargained-for) limitations period.").

[256] *Spazio*, 970 A.2d at 183.

[257] *de Adler v. Upper New York Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013).

[258] *Spazio*, 970 A.2d at 183-84.

applies.'"[259]  That rule can be modified by Delaware's borrowing statute, 10 *Del. C.* § 8121, which requires the Court to apply the shorter limitations period of either Delaware or the "the state or country where the cause of action arose."[260]  I need not analyze whether the borrowing statute applies because Plaintiffs' claims as pled are timely under both Delaware and Mexican law.[261]

The applicable Delaware statute of limitations for negligent misrepresentation is three years.[262]  "The period of limitations normally begins to run at the time of the wrongful act" and "[i]gnorance of the cause of action will not toll the statute, absent concealment or fraud, or unless the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."[263]  "[W]hen an inherently unknowable injury . . . has been suffered by one blamelessly

---

[259] *TrustCo Bank v. Mathews*, 2015 WL 295373, at *5 (Del. Ch. Jan. 22, 2015) (quoting *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *4 (Del. Super. Ct. Apr. 16, 2014)).

[260] "The Delaware Supreme Court has held that there are certain situations in which the Borrowing Statute does not apply[.]"  *Id.* at *7 (citing *Saudi Basic Indus. Corp. v. Mobil Yanbu Petrochemical Co.*, 866 A.2d 1 (Del. 2005)).

[261] Although the borrowing statute does not come into play, I note that it would only apply against those Plaintiffs who were not Delaware residents when the causes of action accrued.  10 *Del. C.* § 8121 ("Where the cause of action originally accrued in favor of a person who at the time of such accrual was a resident of this State, the time limited by the law of this State shall apply.").

[262] 10 *Del. C.* § 8106; *see Krahmer v. Christie's Inc.*, 903 A.2d 773, 778 (Del. Ch. 2006) (holding that "the applicable statute of limitations is 10 *Del. C.* § 8106, which imposes a three-year period for claims of negligent misrepresentation and equitable fraud").

[263] *Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004) ("*Coleman II*").

ignorant of the act or omission and injury complained of, and the harmful effect thereof develops gradually over a period of time," Delaware courts may toll the limitations period to begin running "when the harmful effect first manifests itself and becomes [] ascertainable."[264]

Plaintiffs argue that the limitations period should be tolled under the discovery rule as an inherently unknowable injury and plead that they "were not aware of any discrepancies in [the] financial statements" audited by Defendants.[265] Defendants counter that no tolling should apply, but do not explain how Plaintiffs could have been aware of the allegedly fraudulent scheme underpinning the Complaint until February 2014, much less an explanation that is clear from the face of Plaintiffs' Complaint. According to the Complaint, OSA fooled the public until the investigations by Mexican authorities and Citigroup unearthed the alleged fraud. Plaintiffs are not omniscient. I hold Plaintiffs have adequately alleged that their claims are premised on an inherently unknowable injury, such that the limitations period would be tolled to begin running on February 28, 2014. Plaintiffs filed this action on February 26, 2016, well within the three-year period.

---

[264] *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 133 (Del. 1974); *cf. Coleman II*, 854 A.2d at 842 (noting that Delaware courts have found inherently unknowable injuries in cases claiming accounting malpractice "because of the special character of the relationship between the professional and the client, and the inability of a layperson to detect the professional's negligence").

[265] *See, e.g.*, Compl. ¶¶ 104, 121, 136, 143, 150, 157, 164, 183, 193; *see also* Opposition Br. 102-05; *Coleman II*, 854 A.2d at 842.

Mexican law compels the same result. The parties' experts agree that Mexico applies a two-year statute of limitations for claims like those in the Complaint. They also agree that there are two potential sources for the limitations period: MFCC Article 1161, which runs from the date the illicit behavior occurred, and MFCC Article 1934, which runs from the date the damage was caused.[266] Gonzalez claims, and Loperena at least implies, that Article 1934's limitations period is generally interpreted as running from the date "the 'affected party has knowledge of the damage.'"[267] Loperena asserts without authority that Mexican courts enforce Article 1161 instead of Article 1934 to prevent indefinite liability.[268] Gonzalez rebuts Loperena's assertion with supporting citations to Mexican law and its Civil Code, and persuasively argues that Article 1934 applies here.[269]

Defendants have "the burden of adequately proving the substance of the foreign law."[270] I hold that Defendants have failed to establish that Mexico's limitations period would run from the date of the relevant Audits. Instead, Plaintiff has pled facts that support tolling the limitations period under either Delaware or Mexico law.

---

[266] Gonzalez Decl. ¶¶ 105-109; Loperena Decl. ¶¶ 39-43.

[267] Gonzalez Decl. ¶ 108; *see also* Loperena Decl. ¶¶ 39-43.

[268] Loperena Decl. ¶¶ 39-43.

[269] Gonzalez Decl. ¶¶ 110-119.

[270] *Vichi*, 85 A.3d at 765.

Based on the Complaint, two potential dates may have put Plaintiffs on notice of their claims for tolling purposes. On February 11, 2014, the SFP published its conclusions that "in nine contracts with Pemex, [OSA] had failed to provide insurance policies covering 10% of the value of the contract," and thus temporarily "banned [OSA] from entering into new contracts with Pemex."[271] On February 28, 2014, Citigroup published the results of its internal investigation into the cash advance facility, which Plaintiffs allege was a "respon[se]" to the SFP's determination.[272] Because Plaintiffs filed their Complaint on February 26, 2016, their claims would be untimely under Mexican law if they were tolled only until February 11, 2014. Plaintiffs assert that their claims should be tolled until February 28, 2014. Other than denying that tolling applies in general, Defendants have not explained why February 11, 2014, or some earlier date, may be the appropriate tolling anchor.

Drawing all appropriate inferences in Plaintiffs' favor, while mindful of their obligations to plead tolling, I do not believe it "clear from the face of the complaint that an affirmative defense exists and that [Plaintiffs] can prove no set of facts to avoid it."[273] The Complaint supports a reasonable inference for tolling Plaintiffs'

---

[271] Compl. ¶¶ 267-70.

[272] *Id.* ¶¶ 273-83.

[273] *Spazio*, 970 A.2d at 183-84.

claims until February 28, 2014.[274]  Under either jurisdiction's statutes of limitation, I deny the Motions to Dismiss the Complaint as untimely.

## III.  CONCLUSION

As specified above, I grant the Motions to Dismiss under Rules 9(b), 12(b)(2), and 12(b)(6).[275]

---

[274] *See ODN Holding Corp.*, 2017 WL 1437308, at \*43 (denying motion to dismiss on timeliness grounds where complaint supported a reasonable inference of tolling).

[275] Plaintiffs did not have the benefit of Court of Chancery Rule 15(aaa) when briefing the Motions to Dismiss in the Superior Court.  The parties re-submitted the fully briefed Motions to this Court to "rule on the . . . issues that remain outstanding," and did not raise Rule 15(aaa) at that time.  D.I. 2 at 2.  At the Hearing, however, the parties disputed whether Rule 15(aaa) applies to the Motions.  *See* Hearing Tr. 73-74, 158-61; *see also* D.I. 56 at ¶ 10 n.7; D.I. 64 at ¶ 7.  In order to rule which grounds for dismissal in this opinion shall apply with or without prejudice, I request either a stipulated implementing order or letter briefing from the parties, subject to an agreed-upon schedule.